John B. ANDERSON, George H. Hetrick, Leslie Laufman, M.D. and Gerald M. Eisenstat, Plaintiffs,

v.

Anthony J. CELEBREZZE, Jr., Secretary of State of Ohio, Defendant.

No. C–2–80–400.

United States District Court, S. D. Ohio, E. D.

July 17, 1980.

James E. Pohlman, Columbus, Ohio, Mitchell Rogovin, George T. Frampton, Jr., Washington, D. C., Arthur Eisenberg, New York Civil Liberties Union, New York City, Bruce A. Campbell, ACLU of Ohio Foundation, Columbus, Ohio, for plaintiffs.

Joel S. Taylor, Thomas V. Martin, Adrienne C. Lalak, Asst. Attys. Gen., State of Ohio, Columbus, Ohio, for defendant.

OPINION

DUNCAN, District Judge.

Plaintiff John B. Anderson is an independent candidate for the office of President of the United States. He declared his independent candidacy on April 24, 1980. On May 16, seeking to place his name on the November ballot in Ohio, Anderson tendered to defendant Anthony J. Celebrezze, Jr., Secretary of State of Ohio, those documents required by Ohio law to effect Anderson's nomination as a candidate for that office. The defendant rejected Anderson's filing, citing as the sole ground therefor Anderson's failure to file by the deadline set by Ohio Revised Code (R.C.) § 3513.257. That deadline requires an independent to file his nomination papers 75 days before the primary election in June.

In this election year, the filing deadline falls on March 20, 1980, some 229 days prior to the general election. Upon the rejection of his nominating petition, plaintiff Anderson and three of his supporters filed this lawsuit seeking injunctive relief to place his name on the ballot as well as a declaration that R.C. 3513.257 operates to violate the constitutional rights of Anderson and of electors and voters supporting him in Ohio and across the nation.

Jurisdiction is invoked pursuant to Article II, § 1, Article VI, and the First, Fifth and Fourteenth Amendments of the Constitution of the United States; 28 U.S.C. §§ 1331, 1343(3), and 2201–02; and 42 U.S.C. § 1983.

The case is before the Court on the parties' cross-motions for summary judgment and on plaintiffs' motion for preliminary

injunction. The parties have submitted this case on a lengthy stipulation of facts which is appended to this opinion. Following an expedited briefing schedule, the matter was argued to the Court on June 26, 1980. Because there appears to be no genuine issue as to any material fact, the Court finds this case appropriate for summary judgment. Fed.R.Civ.P. 56(c).

Upon careful consideration of the important issues here presented to it, the Court holds that R.C. 3513.257 imposes a substantial burden on plaintiffs' fundamental rights and is not justified by any compelling state interest. Accordingly, the Court concludes that the statute is unconstitutional and the defendant must accept plaintiffs' nominating petition and other documents for processing.[1]

### Discussion of Law

Defendant Celebrezze concedes that the sole reason for rejecting Anderson's filing was that it was not tendered by March 20. Therefore, the sole statutory provision at issue in this case is the first sentence of R.C. 3513.257 [2] which establishes the time deadline for the filing of a declaration of candidacy and nominating petitions necessary to qualify an independent for candidacy.

This filing deadline has emerged virtually unscathed from the rather tumultuous course the Ohio election laws have taken since the Supreme Court subjected them to thorough examination in the landmark case of *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). In *Williams* the Court held that the Ohio electoral scheme, taken as a whole, burdened voting and associational rights, working an invidious discrimination in violation of the Equal Protection Clause.[3] The statutory scheme required an unusually high number of signatures (15% of the ballots cast in the last gubernatorial election), a highly structured state political organization, a primary election conforming to detailed and rigorous standards, and an early filing deadline. It made no provision for independents or for write-in candidates. Finding that the electoral scheme effectively excluded minor parties from the electoral process and operated to preserve the position of the two major parties as the only meaningful contenders on the Ohio ballot, the Court upheld a challenge by two minor parties seeking access to the presidential election ballot.

Since that time, Ohio has significantly lowered its signature requirement to 5,000, which in this election year amounts to about twelve one-hundredths of one percent of the vote in the last presidential contest. It now permits write-in votes for candidates filing a declaration of candidacy and a slate of presidential electors 20 days before the election. R.C. 3513.041. It permits independents to run for President and minor parties to qualify without primary elections.

Viewing the present statutory scheme as a whole it is arguable that these changes softened the restrictive impact of the filing

---

1. Having resolved below that the statute is unconstitutional under the First and Fourteenth Amendments, the Court does not reach plaintiffs' claims under the Supremacy Clause of Article VI of the United States Constitution.

2. This sentence reads:
 Each person desiring to become an independent candidate for an office for which candidates may be nominated at a primary election, except persons desiring to become independent joint candidates for the offices of governor and lieutenant governor, shall file no later than four p. m. of the seventy–fifth day before the first Tuesday after the first Monday in June [*i. e.*, the date of the primary election, *see* R.C. 3513.-01] at which such candidacy is to be voted for by the voters, a statement of candidacy and

nominating petitions provided in section 3513.-261 of the Revised Code.

3. Mr. Justice Black's opinion for the Court was joined by three other justices. Mr. Justice Douglas joined in the opinion and concurred in the decision emphasizing that the First Amendment and the Due Process Clause of the Fourteenth Amendment provided an additional source of protection for plaintiffs' rights. Mr. Justice Harlan concurred in the result, stating in his view the decision should rest entirely on the basic right of political association assured by the First Amendment and the Due Process Clause of the Fourteenth Amendment. Mr. Justice Stewart, Mr. Justice White and Mr. Chief Justice Warren dissented.

deadline. In addition, the deadline itself has since been amended to fall later in the election year. In 1968 the filing date fell on February 7. *Williams v. Rhodes, supra,* 393 U.S. at 26, 89 S.Ct. at 8. Thus the precise issue presented here, namely, whether the present Ohio filing deadline works an unconstitutional deprivation, was not decided by the Supreme Court in *Williams v. Rhodes.*

On the other hand, and notwithstanding the changes noted, the deadline remains substantially the same as the deadline forming part of the restrictive statutory scheme enacted between 1948 and 1952 after the Henry Wallace campaign in 1948, *see Socialist Labor Party v. Rhodes,* 318 F.Supp. 1262, 1269 and n.11 (S.D.Ohio 1970) (three–judge court); *Williams v. Rhodes, supra,* 393 U.S. at 47 n.9, 89 S.Ct. at 19 n.9 (Harlan, J., concurring), and expressly included by the Supreme Court among the laws comprising the restrictive scheme it held unconstitutional in *Williams.* 393 U.S. at 27, 89 S.Ct. at 8.

### *The First Amendment and Fundamental Rights Implicated by R.C. 3513.257*

Ballot access jurisprudence has undergone considerable development in the 12 years since the Court decided *Williams v. Rhodes.* The appropriate starting point in this analysis is, therefore, the most recent Supreme Court opinion in the area of ballot access laws, *Illinois Board v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). While that case dealt with a different type of restriction–signature requirements–than is at issue here, it summarizes succinctly the fundamental rights implicated by restrictions on ballot access:

> Restrictions on access to the ballot burden two distinct and fundamental rights, "the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." [Citing *Williams v. Rhodes,* 393 U.S. 23 [89 S.Ct. 5, 21 L.Ed.2d 24] (1968)]. The freedom to asso-

ciate as a political party, a right we have recognized as fundamental, see 393 U.S. at 30–31, [89 S.Ct. at 10,] has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because, absent recourse to referendums, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish,* 415 U.S. 709, 716 [94 S.Ct. 1315, 1320, 39 L.Ed.2d 702] (1974). By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self–evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure. *Wesberry v. Sanders,* 376 U.S. 1, 17 [84 S.Ct. 526, 534, 11 L.Ed.2d 481] (1964); *Reynolds v. Sims,* 377 U.S. 533, 555 [84 S.Ct. 1362, 1378, 12 L.Ed.2d 506] (1964); *Dunn v. Blumstein,* [405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274] (1972)]. *Id.* at 184, 99 S.Ct. at 990.

R.C. 3513.257 does abridge fundamental rights of the plaintiffs. The deadline prevents plaintiff Anderson from appearing as a candidate on the Ohio ballot in the November election. It likewise prevents plaintiff George H. Hetrick from qualifying as a candidate for presidential elector pledged to support Anderson in that election. In so doing, the law clearly burdens these plaintiffs' rights of expression and association secured by the First Amendment. It implicates an individual's "important interest in the continued availability of political opportunity," *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974), and his right "to associate for the advancement of political beliefs." *Williams v. Rhodes, supra,* 393 U.S. at 30, 89 S.Ct. at 10. Denying these plaintiffs access to the ballot may not directly penalize the exercise of their right to associate, but it does diminish the effectiveness of their exercise of the right.

While Anderson may still participate in the election by virtue of Ohio's write–in procedure, it requires little discussion to

recognize that a write–in candidacy is an inadequate alternative to ballot placement. As the Supreme Court observed in *Lubin v. Panish, supra,* 415 U.S. at 719, n.5, 94 S.Ct. at 1321, n.5 "[t]he realities of the electoral process . . . strongly suggest that 'access' via write–in votes falls far short of access in terms of having the name of the candidate on the ballot."

The First Amendment associational rights implicated by the deadline are inextricably bound up with a candidate's First Amendment rights of expression, which are also abridged by the filing deadline. As the Supreme Court recognized in *Illinois Board, supra,* 440 U.S. at 186, 99 S.Ct. at 991, "an election campaign is a means of disseminating ideas as well as attaining political office. . . . Overbroad restrictions on ballot access jeopardize this form of political expression." In some ways, ballot placement may signal the political viability of a campaign and trigger funding, media coverage, and credibility in the minds of voters. All serve to open channels for the dissemination of the candidate's political message.

In a similar fashion the individual's right to a place on the ballot overlaps with and is intertwined with fundamental rights of the voters. *Williams v. Rhodes, supra,* 393 U.S. at 30, 89 S.Ct. at 10; *Lubin v. Panish, supra,* 415 U.S. at 716, 94 S.Ct. at 1320. By preventing Anderson from appearing on the ballot, the filing deadline denies plaintiff Leslie Laufman, M.D., and other registered voters in Ohio like her who wish to cast their vote in the 1980 general election for the slate of electors pledged to Anderson, the constitutional right to associate for the advancement of political beliefs, *Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 307–08, 38 L.Ed.2d 260 (1974) and the fundamental right "to cast their votes effectively" for the candidates of their choice. *Williams v. Rhodes, supra,* 393 U.S. at 23, 89 S.Ct. at 5. As with the expression and associational rights of the candidates

themselves, the right to vote "has diminished practical value if the party [or candidate] can be kept off the ballot." *Illinois Board, supra,* 440 U.S. at 184, 99 S.Ct. at 990.

Furthermore, in the case of a national presidential race, the state deadline affects the rights of voters supporting Anderson not only in Ohio, but also in other states where his name will appear on the ballot. Plaintiff Gerald M. Eisenstat is a registered voter in the State of New Jersey where Anderson's name has been certified to appear on the ballot in the 1980 general election. Eisenstat intends to cast his vote for the slate of electors pledged to Anderson in New Jersey. As of June 9, 1980, supporters of Anderson have gathered sufficient signatures (if determined valid) in each of ten states to place his name on the ballot as an independent candidate for President. Active petition drives are underway in nine additional states. Anderson's political campaign organization, the National Unity Campaign, has established an extensive network of offices nationwide. The Campaign intends to obtain and file the requisite number of signatures to qualify for the ballot in all the remaining states as quickly as possible. In addition to Ohio, it appears that Anderson has not met the filing deadlines of four states. The Anderson Campaign has instituted or intends to institute actions, if necessary, challenging those deadlines in order to obtain access to the ballots in those states as well.[4]

The goal of voters such as plaintiff Eisenstat in states where Anderson will appear on the ballot is to amass enough electoral votes to elect Anderson. Ohio's deadline, by denying Anderson a place on the ballot, removes the sixth largest slate of electors from Anderson's reach and thereby reduces the total pool of electoral votes for which he may compete nationwide by 25 electors. This arguably dilutes the vote of Eisenstat and others similarly situated. Although in a somewhat different context,

---

4. The Ohio deadline falls earlier in the election year than all but two other states: Maryland and New Mexico. The plaintiffs have already obtained a preliminary injunction placing An-

derson on the ballot in New Mexico. *Anderson v. Hooper,* Case No. 80–432–M (D.N.M. July 8, 1980).

the Supreme Court has noted that "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen." *Reynolds v. Sims*, 377 U.S. 533, 567, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964).

■ The rights implicated by the Ohio filing deadline "rank among our most precious freedoms." *Williams v. Rhodes, supra*, 393 U.S. at 23, 89 S.Ct. at 5. "Other rights, even the most, basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964). The right to vote secures all other First Amendment rights by enabling the people to choose those who would make and enforce the laws; at the same time, it seems to me, voting is itself an exercise of First Amendment rights because it affords a voice for the expression of political preferences and a vehicle for associating for the propagation of political beliefs.

■ In assessing the extent of the burden on the exercise of these rights, the amount of support for a barred candidate is relevant. *See, e. g., Williams v. Rhodes, supra*, 393 U.S. at 34, 89 S.Ct. at 12. Anderson's losses in each of the Republican primaries he entered prior to April 24 indicate quite clearly he did not enjoy support from a majority of the Republican Party. On the other hand, the parties submitted five exhibits summarizing the results of opinion polls conducted by national polling organizations since the announcement of Anderson's independent candidacy reflecting that he has support from between 23% (nationally) and 44% (New York) of the electorate. He collected contributions from over 40,000 individuals during the five weeks between April 24, 1980 and June 3, 1980. Support for Anderson's independent candidacy appears to be substantial, and the number of persons in Ohio and elsewhere whose fundamental rights are implicated by the Ohio deadline is similarly substantial.

*The Standard of Review under the First and Fourteenth Amendments*

■ When rights as fundamental as these are substantially abridged by legisla-

tive enactment, the First and Fourteenth Amendments command that the law may be justified only if it is necessary to achieve a compelling state interest. I believe this is the import of the Supreme Court's decision in *Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1974). In *Kusper* the Court, in striking down a voter disqualification law, made no mention of the Equal Protection Clause, but grounded its decision directly on First Amendment protection of political association and the Due Process Clause of the Fourteenth Amendment:

There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. *NAACP v. Button*, 371 U.S. 415, 430 [83 S.Ct. 328, 336, 9 L.Ed.2d 405;] *Bates v. Little Rock*, 361 U.S. 516, 522–523 [80 S.Ct. 412, 416, 4 L.Ed.2d 480;] *NAACP v. Alabama*, 357 U.S. 449, 460–461 [78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488.] The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. *Williams v. Rhodes*, 393 U.S. 23, 30 [89 S.Ct. 5, 10, 21 L.Ed.2d 24.] Cf. *United States v. Robel*, 389 U.S. 258 [88 S.Ct. 419, 19 L.Ed.2d 508.]

To be sure, administration of the electoral process is a matter that the Constitution largely entrusts to the States. But, in exercising their powers of supervision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections. See, *e. g., Dunn v. Blumstein*, 405 U.S. 330 [92 S.Ct. 995, 31 L.Ed.2d 274;] *Kramer v. Union School District*, 395 U.S. 621 [89 S.Ct. 1886, 23 L.Ed.2d 583;] *Carrington v. Rash*, 380 U.S. 89 [85 S.Ct. 775, 13 L.Ed.2d 675.] As the Court made clear in *Williams v. Rhodes, supra*, unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments. 393 U.S., at 30 [89 S.Ct. at 10.] And see *id.*, at 35–41 [89 S.Ct., at 12–15] (Douglas, J., concurring); *id.*, at

41–48, [89 S.Ct. at 15–19] (Harlan, J., concurring).

. . . . .

As our past decisions have made clear, a significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest. *Bates v. Little Rock, supra* [361 U.S.], at 524 [80 S.Ct., at 417;] *NAACP v. Alabama, supra* [357 U.S.], at 463 [78 S.Ct., at 1172].

*Id.* at 56–58, 94 S.Ct. at 307. And the Court in *Kusper* made it clear that a law infringing these rights be the least restrictive means to achieve the State's interest:

For even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. ... If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231.

*Id.* at 58–59, 94 S.Ct. at 308. And see *American Party of Texas v. White,* 415 U.S. 767, 780, 94 S.Ct. 1296, 1305, 39 L.Ed.2d 744 (1974) in which it was stated, "whether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discrimination against parties not polling 2% of the last election vote, their validity depends upon whether they are necessary to further compelling state interests." (Citing *Storer v. Brown,* 415 U.S. 724, 729–33, 94 S.Ct. 1274, 1278–80, 39 L.Ed.2d 714 (1974); footnote omitted). *See also Williams v. Rhodes, supra,* 393 U.S. at 35–41, 89 S.Ct. at 12–15 (Douglas, J., concurring); *id.,* at 44–48, 89 S.Ct. at 17–19 (Harlan, J., concurring).

It may be that after *Kusper v. Pontikes* it is enough to find that a law such as this abridges constitutionally protectible rights under the First Amendment to trigger the State's duty to establish a compelling state interest justifying that abridgment. Nevertheless, the plaintiffs assert their claims additionally under the Equal Protection Clause of the Fourteenth Amendment. The Court will now address that argument.

### Equal Protection

Plaintiffs' equal protection argument, simply put, is that the deadline unfairly discriminates against independent candidates with respect to the time when they, as compared with candidates of both major and minor parties, are required to qualify as candidates for the general election.

Under Ohio law, the names of the candidates of the two major parties are placed on the general election ballot by the Secretary of State after they are nominated by their respective national party conventions. R.C. 3505.10, 3513.11. In 1980, in the case of the Democratic candidate, this will not occur until approximately August 18. Minor party candidates need not certify their nominees to the Secretary of State until 75 days before the general election, that is, on or about August 20. R.C. 3505.10. This year the defendant will prepare the ballot after the completion of the national party nominating conventions in mid to late August.

The thrust of plaintiffs' argument appears to be that the early filing deadline compels independent candidates to declare their candidacy 75 days prior to the *primary* election, four to five months earlier than partisan candidates. By doing so, the deadline effectively locks independents into place on March 20, 1980, leaving the parties until late August to develop the issues and to choose a nominee they hope will best respond to those issues.

Viewed in another way, the deadline operates to bar any independent candidacies not declared by March 20 although party candidates may run in the general election without having filed on that date.

### A

The Secretary of State argues that similar treatment is afforded the different types of candidates, and that no discrimination occurs because party candidates are also required to meet the March 20 deadline by causing their delegates to file at that time in order that they may participate in

the primary. The delegates, according to the Secretary of State, are in actuality surrogates for the candidate himself. Defendant argues that because the delegates are bound by local party rules to cast their first ballot at national nominating conventions for the candidate chosen by Ohio voters in the primary, and because the role of party primaries in the nominating process has become more important in recent years, it is unlikely that a party candidate can sit on the sidelines during the primaries, as for example General Eisenhower did in 1952, and become the nominee of a major party.

Therefore, according to the defendant's reasoning, both partisan and independent candidates for the most part are held to the same March 20 deadline, and there is no disparate treatment of them.

The Court cannot accept defendant's argument. The Ohio statutes require the independent to commit himself early in the election year to his independent candidacy and grant the parties, both major and minor, until late August to choose their candidates. Regardless of the likelihood of such an occurrence, the statutes do permit a partisan candidate to receive the nomination of his party and thereby appear on the Ohio general election ballot in November, without previously having had to file with the Secretary of State. To these partisan candidates, emerging from the political conventions in mid–summer, R.C. 3513.257 has no application. If a party candidate does not file on March 20, he is by no means barred from running as his party's choice in the coming general election. An independent's failure to file at that early date does in fact work such a forfeiture.

In addition, defendant's argument tends to ignore material differences between running as a candidate in the general election and running as a candidate in a party primary. In order to win the primary, partisan primary candidates aim to attract the support of other partisans. At a general election, candidates appeal to the entire national constituency. Before the party primaries, surely the general election campaign issues and the positions of the candi-

dates have not yet crystallized. The platform positions upon which party candidates run in the general election are hammered out at the convention, long after the primary. When the party candidate files his declaration of candidacy on March 20, he is making the statement that he intends to vie in the primary for the votes of members of his party: whether he will run in the general election as his party's choice is by no means assured. On the other hand, when the independent files his declaration of candidacy and his nominating petitions on March 20, he is making the statement that he intends to run, not in the primary, for he is not in that race, but in the general election in November.

In some respects, running in the party primary is an exercise–an experiment aimed at determining whether the candidate can raise enough support and enthusiasm among party members to allow for a continued quest for the presidency. By March 20, before the primary winners are known or party platforms established and far ahead of the final selection of the party candidates, the independent must evaluate the support and enthusiasm for his candidacy and determine whether he should run in the general election seven months later.

For these reasons, the Court concludes that the Ohio statutory scheme does in fact treat partisans and independents differently. The question then becomes whether these differences in treatment are justified by functional dissimilarities between the two types of candidacies.

B

The Supreme Court has noted that "[t]he fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and in providing different routes to the printed ballot." *American Party of Texas v. White*, 415 U.S. 767, 782 n.13, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974), quoting from *Jenness*

*v. Fortson*, 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1975–76, 29 L.Ed.2d 554 (1971). The Supreme Court has recognized that it could be a violation of equal protection were the State to treat identically what in the political arena are two fundamentally different forms of candidacy. *Jenness v. Fortson, supra*, 403 U.S. at 442, 91 S.Ct. at 1976.

█ Applying this reasoning, it can be argued that there may be no invidious discrimination between entities which are by nature to be handled differently. One cannot compare for all purposes the independent candidate with the candidate who conducts his campaign within the party system; nor can one compare him with a party. It seems equally clear, however, that statutory line–drawing that operates to abridge fundamental rights of some persons must be explicable in terms of differences between the persons on either side of the line.

In the Court's view, the partisan candidate for the national office of President is similar enough in critical ways to the independent candidate for that office, that to treat the two dissimilarly, *i. e.*, by subjecting the independent to R.C. 3513.257 and not the partisan, arguably states a claim under the Equal Protection Clause.

Thus notwithstanding the extreme importance of the partisan candidate's affiliation with the support superstructure and machinery of a political party, a critical element of his success or failure at the general election is the personal constituency which must rally to his cause. This vital support depends significantly on the candidate's appeal as an individual.

Likewise an independent candidate looks to develop a constituency that is attracted to him as an individual as well as to his stance on the issues. It is not, then, unrealistic to find that a voter seeking a presidential candidate to support often looks not so much at labels, but at *persons*. Because the personal and issue appeal of a partisan candidate vies in many respects equally on the political field with the independent's personal and issue appeal, the disparate treatment accorded these candidates in Ohio may well be suspect under the Equal Protection Clause.

█ At minimum there is sufficient similarity in the candidacies of the two to require that any law treating them differently be narrowly drawn to afford the greatest protection to the fundamental rights involved.

### The Standard of Review under the Equal Protection Clause of the Fourteenth Amendment

In *Illinois Board v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), the Court applied a standard equal protection analysis, balancing the interests of the State in maintaining a classification against the burdens on fundamental rights imposed by the classification, and holding that the classification was unnecessary to achieve any compelling interest:

When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest. *American Party of Texas v. White*, 415 U.S. 767, 780–81 [94 S.Ct. 1296, 1305–1306, 39 L.Ed.2d 744] (1974); *Storer v. Brown*, 415 U.S. 724, 736 [94 S.Ct. 1274, 1282, 39 L.Ed.2d 714] (1974); *Williams v. Rhodes, supra*, at 31 [89 S.Ct. at 10.]

. . . . .

The signature requirements ... are plainly not the least restrictive means of protecting the State's objectives. ... appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago.

*Id.* at 184–86, 99 S.Ct. at 991.

The Secretary of State argues vigorously that the compelling interest standard stated in *Illinois Board* is not applicable to this case because the Supreme Court in *Illinois Board* dealt with a statute which, on its face, evidenced a blatant discrimination. The defendant urges further that the Court should employ a test set forth in *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) and *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) to require a preliminary showing by

plaintiffs that Anderson is a "reasonably diligent candidate" before bringing a compelling state interest analysis into play.

The Court rejects both of these arguments for the following reasons. First, it is clear from the language of the Court's opinion in *Illinois Board* and from the facts of that case that it was analyzing the constitutionality of the statute as applied rather than on its face.[5]

Second, the Supreme Court in *Storer* and *Mandel* did not eschew the application of a compelling interest standard of review. A careful reading of the *Storer* opinion indicates the Court applied that standard, finding that a compelling state interest justified barring one set of plaintiffs from the ballot, and that its application was frustrated by an inadequate record as to the others.

The defendant's contention that the *Storer* Court propounded a new test establishing a threshold which must be crossed by the challenger before the State need assert any compelling interest is predicated on the following passage from that opinion:

> Third, once the number of signatures required in the 24-day period is ascertained, along with the total pool from which they may be drawn, there will arise the inevitable question for judgment: in the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?

*Storer v. Brown*, 415 U.S. 724, 742, 94 S.Ct. 1274, 1285, 39 L.Ed.2d 714 (1974). *See also Mandel v. Bradley*, 432 U.S. 173, 177–78, 97 S.Ct. 2238, 2241, 53 L.Ed.2d 199 (1977).

Placing the passage in its proper context, the Court simply cannot accept the defendant's novel theory that this passage propounds a new standard of review in ballot access cases.[6] The passage relates to a claim that the statutory requirement that independent candidates obtain a given per-

---

5. The statute at issue in *Illinois Board* provided different signature requirements for different political offices. Thus, new political parties and independents were required to obtain the signatures of 25,000 qualified voters to appear on the ballot in statewide elections. 440 U.S. at 175, 99 S.Ct. at 986. In order to appear on the ballot for offices of political subdivisions of the state, the signatures of 5% of the number of persons voting in the last election for offices within the particular subdivision were required. That this distinction does not facially demonstrate blatant discrimination is plain, given that in most subdivisions of a state, 5% of the voters in a particular subdivision election would represent far fewer than 25,000 signatures. The Court recognized "[t]hat the distinction between state and city elections undoubtedly is valid for some purposes" but that this fact did "not resolve whether it is valid *as applied here*." *Id.* at 184, 99 S.Ct. at 990. The Court found that the distinction, "*as applied in the City of Chicago*," *id.* at 183, 99 S.Ct. at 990, produced the incongruous result that a new party or an independent candidate for mayor of Chicago need obtain substantially more than the 25,000 signatures required for a statewide office. Because Chicago is such a populous subdivision, 5% of the voters at previous Chicago elections exceeded 25,000. Finding no compelling interest advanced to justify the apparent anomaly, the Court did not strike down the statute as invalid on its face but limited its holding to the City of Chicago. *Id.* at 187, 99 S.Ct. at 992.

6. In *Storer*, four independents sought access to the ballot, two for the United States Congress and two for the national offices of President and Vice President. All four challenged provisions of the California Elections Code forbidding ballot position to an independent if he voted in the preceding primary, had a registered affiliation with a qualified political party within one year prior to the last primary, or obtained signatures of less than 5% of the vote cast in the last general election. All signatures were required to be obtained in a 24-day period and none could be those of voters at the primary. *Storer v. Brown*, 415 U.S. 724, 726–27, 94 S.Ct. 1274, 1277, 39 L.Ed.2d 714 (1974).

In Part I of the opinion, the Court found that both men seeking congressional office were disqualified by their affiliation with a political party within the preceding year. Applying the test set forth in *Williams v. Rhodes*, the Court concluded the disaffiliation requirement served a compelling state interest. *Storer v. Brown, supra,* 415 U.S. at 736, 94 S.Ct. at 1282. *See infra.* Finding these candidates validly barred, the Court found no need to examine the other challenged provisions as applied to them.

In Part II, the Court addressed the challenges of the presidential hopefuls to the signature provisions requiring at least 5% of the prior vote cast to be gathered in 24 days from persons who had not voted in the primary. Attempting to apply an equal protection balancing analysis, the Court found itself unable to ascertain the precise impact of the laws, a

centage of signatures within a 24–day period unfairly excluded independents from the ballot.

The test stated by the Supreme Court in *Storer* is a guide for determining the facts relevant to the legal questions raised by the petitioners in *Storer*. Obviously, one cannot balance considerations whose relative weight is unknown. It was necessary for the trial court to apply the test stated by the Supreme Court in *Storer* to arrive at the facts necessary to apply the standard established by other cases.

Third, the *Storer* test is inapplicable to the facts of the case at bar. Anderson does not claim that the filing deadline or any other Ohio law places an onerous burden on him to gather sufficient signatures to show substantial community support.[7] The facts submitted by the parties show that Anderson supporters gathered more than three times the number of required signatures in Ohio within a five–day period. There can be no question that Anderson was "reasonably diligent" in satisfying Ohio's minimal signature requirements once he decided to run as an independent.

█ The "reasonable diligence" of the candidate is simply not a relevant consider-

---

finding crucial to the determination of whether they were necessary means to a legitimate end. In order to determine the extent of the burden imposed by the 5% requirement, it was necessary to know how many votes were cast in the preceding election. In order to know whether that number could reasonably be obtained from persons not voting in the primary, it was necessary to know how many persons voted in the primary. Only then could the Court "assess realistically" the impact of the law on prospective candidates. *Storer v. Brown, supra*, 415 U.S. at 738, 94 S.Ct. at 1283.

Accordingly, the Court remanded the case for further factfinding. Before doing so, however, the Court resolved three issues to clarify the guidelines for further proceedings in the district court. The first concerned the validity of disqualifying persons voting in the primary from signing an independent's petition. The second voiced the Court's concern that the disqualification of such persons who voted in a nonpartisan primary may not have been supported by a compelling state interest. The third is the passage quoted above, stating the test to be applied once the facts were found regarding the number of signatures required.

7. The defendant urges that the Supreme Court's decision in *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) is factually analogous to the case before the Court because it concerned an early filing date with no time limit for gathering signatures. In *Bradley*, the Supreme Court criticized the lower court for construing its summary affirmance in another case, *Tucker v. Salera*, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), *aff'g* 399 F.Supp. 1258 (E.D.Pa.1975), as controlling precedent for the broad proposition that early filing dates were unconstitutionally burdensome on an independent's access to the ballot. *Bradley, supra*, 432 U.S. at 175, 97 S.Ct. at 2240. The Court distinguished *Salera* from *Bradley* on the grounds that in addition to the early filing date in *Salera* there was also a limited time period for gathering signatures, which increased the difficulty of meeting the signature requirements. *Id.* at 177, 97 S.Ct. at 224. As it had done in *Storer*, the Supreme Court remanded the *Bradley* case for further factual inquiry, instructing the district court to undertake the *Storer* inquiry into the ability of a reasonably diligent candidate to satisfy the ballot access requirements. Reading *Bradley* liberally, one may argue that it commands application of a *Storer* "reasonable diligence" factual inquiry to a challenge to an early filing deadline standing alone and uncomplicated by signature–gathering requirements.

However, the *Bradley* case is distinguishable. Like *Storer*, the issues concerned the State's legitimate interest in requiring some showing of community support and the extent of burdens imposed on a candidate trying to demonstrate that support.

Mr. Bradley himself started quite early and attempted over a period of months to acquire the necessary signatures by the March deadline. Bradley submitted a few thousand more than the 51,755 signatures required, but over 10,000 were thereafter invalidated and he was disqualified. Bradley filed suit challenging both the deadline and the signature requirement on the ground that the "early filing deadline made it more difficult for Bradley to obtain the requisite number of signatures than for a party member to win a primary . . . ." *Mandel v. Bradley, supra*, 432 U.S. at 174, 97 S.Ct. at 2239. He placed in issue the effect of the deadline in combination with the signature requirement to deprive him of the opportunity to demonstrate his community support. In erroneously assuming that the Supreme Court's affirmance in *Salera* mandated a holding that the filing date by itself was *per se* unconstitutional, the District Court failed to undertake an independent analysis of the interaction of the deadline with the signature requirement. *Id.* at 178, 97 S.Ct. at 2241.

ation when the issue posed by the challenged law is a filing deadline, for that deadline, in this case at least, measures only the time that a candidate must reach a decision about whether to run. *See Mandel v. Bradley,* 432 U.S. 173, 181–82, 97 S.Ct. 2238, 2243, 53 L.Ed.2d 199 (1974) (Stevens, J., dissenting). Thus, as plaintiffs noted in oral argument, a "reasonably diligent candidate" could meet the deadline within the meaning of *Storer,* and the deadline could still be constitutionally unsound. For example, if Ohio were to set the filing date in November of the year preceding the general election and require only 100 signatures to qualify for ballot placement, most candidates who had by November decided to run for office would presumably be able to acquire enough signatures, and defendant's *Storer–Bradley* "threshold" test would apparently be satisfied. That fact, however, would not preclude the Court from inquiring whether the State has a compelling state interest in requiring a potential candidate to commit himself so far in advance of the general election.

What is at issue in this case is the State's power to demand that an independent candidate reach a decision about whether to run months before a primary in which he does not take part, and the State's power to require this of him when it is not required of all partisan candidates. I cannot accept the defendant's contention that the State may measure in terms of *Storer–Bradley* "diligence" the time a candidate makes up his mind to run for office.

Finally, the *Illinois Board* analysis states no new principles. It merely applies principles enunciated in earlier cases. In a case concerning the unconstitutionality of poll taxes, the Supreme Court stated "that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

This standard of review was translated into the language of *Illinois Board* through a series of decisions concerning voting and associational rights including *Kramer v. Union School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (state apportionment statutes); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (durational residence laws). *Williams v. Rhodes, supra,* confronted with the unusually heavy burdens discussed above, applied the same test:

> In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP v. Button,* 371 U.S. 438 [83 S.Ct. 328, 9 L.Ed.2d 405] (1964).

 Accordingly, the standard of review under the Equal Protection Clause of R.C. 3513.257 must be whether it is necessary to further a compelling state interest.

### Compelling State Interests

Having found above that the filing deadline substantially abridges First Amendment and fundamental rights of the plaintiffs and discriminates between persons in many respects similarly situated, the Court must determine whether it does so in furtherance of compelling state interests.

 First, it is important to note what state interests are *not* in issue in this case. The defendant does not contend that the filing date of March 20 is necessary to permit the State a certain period of time to perform the administrative tasks necessary to place a candidate's name on the ballot, such as verifying signatures, resolving challenges, and printing ballots. Certainly the State has a legitimate interest in requiring candidates to file their papers in time to perform these administrative matters. *See, e. g., Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975), aff'd, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976). But the Secretary of State has conceded that the nominating petitions filed on March 20 remain

unprocessed in his office until June 15, when he transmits them to county boards of election. The boards do not begin actually verifying the signatures until the period July 1 to July 15. Finally, the Secretary of State does not certify the names of presidential candidates (including independents) for inclusion on the ballot until after the party nominating conventions, sometime in late August. Based upon the stipulated facts, it appears that no more than 75 days are necessary to perform these tasks. The State's interest, from an administrative standpoint, in an orderly processing of names for inclusion on the ballot has not been and cannot be asserted to justify a deadline 229 days prior to the general election.

The Court will now turn to an analysis of the state interests which defendant claims are promoted by the legislation in issue. Chief among the interests asserted is the preservation of the State's political stability. Defendant relies heavily on Part I of *Storer v. Brown, supra,* as support for this proposition. As noted above, in Part I of *Storer* the Supreme Court dealt with a challenge to several provisions of the California Elections Code brought by two independent candidates for Congress. These candidates challenged the Code's "disaffiliation" provisions which prohibit a candidate from running as an independent if he either voted in the immediately preceding primary election or had a registered affiliation with a qualified political party within one year prior to the immediately preceding primary. The Supreme Court had "no hesitation" in sustaining this provision, finding that it advanced a "general state policy aimed at maintaining the integrity of the various routes to the ballot." 415 U.S. at 733, 94 S.Ct. at 1280.

In reaching its decision in *Storer* the Court detailed the nature of the California direct party primary system, the goals of which the Court found were supported by the disaffiliation requirements:

> Section 6830(d) . . . protects the direct primary process by refusing to recognize independent candidates who do not make

early plans to leave a party and take the alternative course to the ballot. It works against independent candidacies prompted by short–range political goals, pique, or personal quarrel. It is also a substantial barrier to a party fielding an "independent" candidate to capture and bleed off votes in the general election that might well go to another party.

. . . . .

> It appears obvious to us that the one–year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status. Nor do we have reason for concluding that the device California chose, § 6830(d) (Supp.1974), was not an essential part of its overall mechanism to achieve its acceptable goals. As we indicated in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1, the Constitution does not require the State to choose ineffectual means to achieve its aims. To conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot.

415 U.S. at 735–36, 94 S.Ct. at 1281. (footnote omitted).

 From the above there can be no doubt that a state has, as the defendant claims, a legitimate and compelling interest in maintaining the stability of its political processes. The defendant argues therefore that R.C. 3513.257 fosters this interest in Ohio by in effect acting as a disaffiliation statute as to Congressman Anderson. In other words, the defendant claims that Anderson would have been able to meet the March 20 deadline if only he had decided at some point earlier than March 20 to disaffiliate, and cease his activities in the Republican state primaries.

Although the defendant's argument has some surface appeal, several points are clear. First, the statute gives absolutely no indication on its face that it was intended to be a disaffiliation provision. Indeed it is difficult to identify any basis for so finding. R.C. 3513.257 would not bar the staunchest party member who decided on March 19 to change horses and file as an independent, for example, nor would it permit a true independent to run, if he or she filed on March 21. Likewise, Anderson apparently could run in the other 49 states as a Republican, and R.C. 3513.257 would not bar him from running as an independent in Ohio so long as he filed here as such by March 20. Thus, unlike the California provisions upheld in *Storer*, which were plainly drafted to effect a comprehensive and nondiscriminatory disaffiliation scheme, *see*, 415 U.S. at 733, 94 S.Ct. at 1280, it is clear that R.C. 3513.257 acts as a disaffiliation provision only by mere happenstance, not by any reasonably discernible legislative design.

Second, even if the Court were to assume that the Act is a disaffiliation provision, the defendant has not been persuasive that the compelling state interest which the Supreme Court found in the context of a statewide election in Part I of *Storer* is equally compelling in an election for the national office of President. Indeed, it is undisputed that California does not even apply its disaffiliation laws to a presidential candidate. Nor has the Court's attention been drawn to any case in which a State's disaffiliation statute has been applied to such a candidate. Thus when the defendant argues that the burden placed on Congressman Anderson by R.C. 3513.257 is minimal compared to the one–year disaffiliation requirement exacted by California, he strains to force a national peg into a state hole.

Finally, Ohio does have a disaffiliation statute of sorts in R.C. 3513.04,[8] the so-called "sore loser" provision, which prohibits a candidate from seeking a place on the general election ballot by means of nominating petition or by write–in when he has filed a declaration of candidacy for a party nomination in the preceding primary. Because Anderson withdrew from the Ohio primary in time to have his name removed from the ballot, the State concedes that R.C. 3513.04 does not apply to him. Nevertheless, the defendant argues that R.C. 3513.04, when combined with R.C. 3513.257 here at issue comprises a "comprehensive yet reasonable regulation" which serves to further the state interests recognized as valid in *Storer*. This attempt to bootstrap R.C. 3513.257 into a compelling interest is not convincing. Again, the mere coincidence of the facts that a filing deadline bars a candidate from getting on the ballot as an independent and that the candidate was formerly a partisan, hardly transforms the deadline statute into a disaffiliation act. Further, the Court is not persuaded that R.C. 3513.257 and 3513.04 "dovetail" into a reasonable and coordinated State scheme for promoting political stability simply because both statutes may operate to bar former partisans from running as independent candidates.

In short, the defendant has demonstrated no interest served by the filing deadline other than its simple function as an arbitrary point in time by which independent candidates must officially throw their hats into the political ring.[9] Nor can

8. The defendant argues that R.C. 3513.04 is directed at barring party–affiliated candidates who lost in the primary from running as independents in the general election. While that is true, the statute also bars them from running as partisans. *See, State ex rel. Gottlieb v. Sulligan*, 175 Ohio St. 238, 193 N.E.2d 270 (1963).

9. The defendants contend that this case is controlled by the Supreme Court's summary affirmance of the decision of *Sweetenham v.*

*Rhodes*, decided together with *Socialist Labor Party v. Rhodes*, 318 F.Supp. 1262 (S.D.Ohio 1970) (three–judge court), *aff'd sub nom. Sweetenham v. Gilligan*, 409 U.S. 942, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972). The Court rejects the defendant's position.

The Supreme Court has repeatedly cautioned against attaching broad precedential significance to summary affirmances. Lower courts are bound by summary actions on the merits by the Supreme Court, *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975),

the Court discern any aspect of the nature of independent versus partisan candidacies to justify compelling independents, and not all partisans, to commit themselves to their candidacy on March 20. Indeed, the functional dissimilarities would appear to counsel against requiring this of independents who do not participate in the primary contest. Defendant has advanced no compelling interest to support the difference in treatment accorded by the Ohio law.

■■■ Defendant argues that the State certainly must set some deadline for filing by independent candidates, and that under Article II, § 1 of the United States Constitution,[10] the State legislature is given broad discretion to direct how and when this may be done. Ohio made a similar argument to the Supreme Court in 1968. The answer of

the Court there, in *Williams v. Rhodes, supra*, is equally applicable here:

There, of course, can be no question but that [Art. II, § 1] does grant extensive power to the States to pass laws regulating the selection of electors. But the Constitution is filled with provisions that grant Congress or the State specific power to legislate in certain areas. These granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution. .... Obviously we must reject the notion that Art. II, § 1, gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions. We therefore hold that no State can pass a law regulat-

but because a summary affirmance affirms the judgment only and not the reasoning of the lower court, *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977), its precedential value is limited to the precise questions presented and necessarily decided by it. *Id.*

A review of the opinion of the three–judge court in *Sweetenham* reveals quite clearly that the constitutional issue here presented was not necessarily decided in the summary affirmance of that judgment. The entire analysis relative to the filing deadline appears at page 1273:

Plaintiffs allege that those parts of Sections 3513.257 and 3513.258, Ohio Revised Code, which require nominating petitions to be filed "not later than 4:00 P.M. of the ninetieth day before the first Tuesday after the first Monday in May immediately preceding [the] general election" are unconstitutional.

The state has an interest in having persons who otherwise qualify for ballot position officially become candidates at a designated time prior to an election. In addition, the state may reasonably require that all persons seeking elective office become officially declared candidates on or before a certain date preceding an election. One may not play dog in a political manger by withholding his determination of candidacy until after party candidates are chosen by the primary process.

The plaintiffs Sweetenham and Stapleton herein had not taken steps to become candidates prior to the May 1970 primary election. Plaintiff Sweetenham had obtained 1,600 signatures on her nominating petition by June 29, 1970. Plaintiff Stapleton had obtained 2,455 signatures on his nominating petition by June 29, 1970. Neither plaintiff has filed or tendered a nominating petition with the designated state or county official. Candi-

dates for parties which participated in the primary election were chosen in the May 1970 primary election. The Socialist Labor Party candidates whom this Court has held are entitled to ballot position were chosen on April 26, 1970.

The Court holds that plaintiffs Sweetenham and Stapleton, who did not officially declare their candidacy at or before the time Ohio requires political parties to choose their nominees, are not entitled to ballot position.

The judgment in *Sweetenham* rests on the failure of the challenging plaintiffs to allege a real and immediate injury presenting a case or controversy within Article III of the United States Constitution that would be capable of adjudication by the district court. Having failed even to tender a nominating petition, neither Sweetenham nor Stapleton were in a position to place in issue a deadline regulating the time for filing those petitions.

The Court, in fact, never reached the constitutional issue and certainly did not decide it. Its discussion of the State's interest in having candidates declare their candidacies by a specific date before an election reflects the Court's concern that the plaintiffs in that case had not taken any steps to qualify themselves as candidates at or before the party candidates were chosen.

For these reasons the Court believes its *Sweetenham* decision is of no precedential effect on the central issues decided herein.

10. The relevant clause provides in pertinent part, "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors ..." to choose a President and Vice President.

ing elections that violates the Fourteenth Amendment's command that "No State shall ... deny to any person ... the equal protection of the laws.

393 U.S. at 29, 89 S.Ct. at 9. Nor can it be doubted that the State legislature's discretion in fixing a filing deadline must be bounded by the First Amendment rights of candidates and voters. Where a deadline acts to impede these rights the Court must perforce analyze the State's interest in imposing such a limitation on important constitutional rights.

In *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) the Court upheld the constitutionality of a New York statute which requires a voter to enroll in the party of his choice at least 30 days before the general election in order to vote in the next party primary. The effect of that statute is to require party registration some eight months before a presidential primary and eleven months before a non-presidential one. The petitioners claimed that the statute unduly burdened their First and Fourteenth Amendment rights to exercise the franchise and to associate with the political party of their choice. The Court framed the issue as follows:

The only remaining question, then, is whether the time limitation imposed by § 186 is so severe as itself to constitute an unconstitutionally onerous burden on the petitioners' exercise of the franchise or on their freedom of political association. As the dissent acknowledges, the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election. ... Hence, our inquiry must be whether the particular deadline before us here is so justified.

. . . . .

It is true that the period between the enrollment deadline and the next primary election is lengthy. But that period is not an arbitrary time limit unconnected to any important state goal.

410 U.S. at 760, 93 S.Ct. at 1251. The *Rosario* Court found that the burden im-posed by the New York statute was justified because it served the important state goal of "preservation of the integrity of the electoral process," 410 U.S. at 761, 93 S.Ct. at 1251, by inhibiting party "raiding." The four–justice dissent argued that the asserted state interest was "hardly substantial enough" to justify the impediment raised by the statute. 410 U.S. at 769, 93 S.Ct. at 1255.

In the Court's view the present case is readily distinguishable from *Rosario* simply because the filing deadline imposed upon independent presidential candidates by R.C. 3513.257 serves no compensating state interest such as that found in *Rosario*. As already noted, the only justification seriously raised by the defendant is that of political stability, a justification which the Court has found to be tenuous at best. Even if the statute in fact served such a legitimate purpose, it would have to do so in a manner which avoids unnecessary restrictions on constitutional freedoms since "[s]tatutes affecting constitutional rights must be drawn with 'precision,' ... and must be 'tailored' to serve their legitimate objectives." *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The Court will now turn to this inquiry.

In 1976 this Court heard a challenge to another provision of Ohio's election laws, R.C. 3513.191, which prohibited a person from running as a party candidate in a primary election if he had voted as a member of a different political party within the preceding four years. *Kay v. Brown*, 424 F.Supp. 588 (S.D.Ohio 1976) (three–judge court). There the State claimed that the statute implemented a number of compelling interests, including the preclusion of political candidacies prompted by short–range goals, ensuring party loyalty, and ensuring that candidates did not affiliate with political parties for "opportunistic reasons." *Id.* at 593. Recognizing that these goals were legitimate ones, this Court nevertheless found that the statute by which the State purported to advance these goals was impermissibly broad, as applied to

the particular plaintiff in the case, since it in effect locked him into a political party which in fact had become defunct. The Court there reminded this defendant's predecessor of the Supreme Court's admonition that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," *id.*, quoting from *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405, and that

> [i]f the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties.

*Id.*, quoting from *Kusper v. Pontikes, supra*, 414 U.S. at 59, 94 S.Ct. at 308.

The Supreme Court reiterated this important theme most recently in *Illinois Board, supra* :

> [O]ur previous opinions have also emphasized that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty . . . and we have required that States adopt the least drastic means to achieve their ends. . . . This requirement is particularly important where restrictions on access to the ballot are involved.

440 U.S. at 185, 99 S.Ct. at 991. (citations omitted). *See also McCarthy v. Austin*, 423 F.Supp. 990, 997 (W.D.Mich.1976).

In the Court's view, R.C. 3513.257 fails the test of precision which it so clearly is required to pass under the doctrine set forth above. The State has advanced no compelling reason for requiring an independent candidate to meet a filing deadline 75 days before a primary election in which he does not participate, and which is some 229 days before the general election.

The State argues that because partisan candidates are required to file at the same time as independents, the early deadline is justified because it treats all candidates "equally." Again, the superficial appeal of this argument fails under scrutiny. First of all, the deadline, set 75 days before the *primary* election, is arguably a reasonable one for the candidates who decide to run in that race. However, the Court cannot find any legitimate state interest in tying an *independent* candidate to that deadline.

The defendant claims that permitting an independent to declare later than party candidates would allow the independent to play "dog in a political manger" by withholding his candidacy until after party candidates are chosen in the primaries. Even assuming that this apprehension has some foundation in a *statewide* election, *see, e. g., Sweetenham v. Rhodes*, 318 F.Supp. 1262, 1273 (S.D.Ohio 1970), which the Court need not now decide, such concern is substantially diminished in a national election where the party candidates are not chosen until July or August and where all candidates must respond to national, not just state, issues. In any event, the Court is not persuaded that the states have a compelling interest in preventing candidates as early as March 21 from emerging and declaring in response to important newly-arising issues, particularly when such candidates may well reflect the conscience of a substantial number of voters. Of course in the context of a presidential election the political parties have an opportunity to respond to such shifting and emerging national issues after the State's filing deadline because they do not name their candidate or establish the party platform until the conventions in late summer.

The Court does not quarrel with the proposition that states generally have an important interest in maintaining their ballots within manageable and understandable limits:

> A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. That no device can be conjured to eliminate every frivolous candidacy does not undermine the State's effort to eliminate as many such as possible.

*Lubin v. Panish, supra*, 415 U.S. at 715, 94 S.Ct. at 1319. Equally important, however, is the concern that access to the ballot of "serious" candidates not be unduly restricted. A State must strike a balance between its interest in maintaining a manageable ballot and its duty to provide access thereto for serious candidates:

> The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not. Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success.

> This legitimate state interest, however, must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters.

*Id.* at 715–716, 94 S.Ct. at 1320.

From the above perspective, Ohio's system for regulating ballot access is less than a model of precision. The State's extremely lenient signature requirements allow ready access to the general election by virtually any candidate seeking a place thereon, yet its early filing deadline can have the effect, as it does here, of arbitrarily interdicting the access of a candidate with undisputed wide community support.

It appears that the State could more effectively strike the required balance by screening the "frivolous" independent candidates for President by, for example, gauging their community support with stricter nominating signature requirements and then moving the filing deadline to a date closer to the general election, thereby making less drastic the present bar to the ballot erected by R.C. 3513.257. Such an alteration is of course a matter for the Ohio legislature and not this Court. What *is* for this Court, however, is the decision whether the deadline set by R.C. 3513.257, as applied to independent candidates for President, passes constitutional muster. Because I find, as detailed above, that the impediment set in the path to the ballot of such candidates by R.C. 3513.257 is unduly restrictive and not justified by any compelling state interest, the statute is constitutionally infirm.

### Conclusion

■ In conclusion, the Court holds that R.C. 3513.257 substantially abridges the constitutional rights of association of Anderson and his supporters and the fundamental right to vote of his supporters. It also discriminates against independent candidates and in favor of partisan candidates. Neither the abridgment nor the discrimination are justified by compelling state interests.

■ It is not the prerogative for this Court to establish a particular filing date which in its judgment would pass constitutional muster. That is a decision for the Ohio General Assembly in the first instance. The Court merely holds that the filing date of March 20, or 75 days before the June primary, is too early in the election year to be justified by a compelling state interest and to be the least restrictive means to achieve the interests it purportedly does serve. Under the circumstances, the Court will grant the plaintiffs the relief they seek and leave to the Ohio legislature the task of establishing a date which serves compelling interests without unnecessarily restricting constitutionally protected liberty.

### APPENDIX

### JOINT STIPULATION OF FACT

The parties agree, by and through their counsel, that the following facts are stipu-

lated to be true and correct, for the purposes and only for the purposes of this case,[1] but the parties reserve all objections on the grounds of relevancy.

1. John B. Anderson seeks to run as an independent candidate for President of the United States in the 1980 general election and meets the qualifications prescribed in the Constitution for election to that office.

2. George H. Hetrick is a duly registered voter in the State of Ohio who has been designated to seek certification as a candidate for Presidential elector in the 1980 general election pledged to the candidacy of plaintiff Anderson. His name was included on a slate of candidates for Presidential electors, pledged to support the independent candidacy of plaintiff Anderson, tendered to defendant Celebrezze on May 16, 1980. Plaintiff Hetrick meets the qualifications prescribed in the Constitution for election to the office of elector.

3. Leslie Laufman, M.D., is a duly registered voter in the State of Ohio who wishes to cast her vote in the 1980 general election for the slate of electors pledged to plaintiff Anderson.

4. Gerald M. Eisenstat is a duly registered voter in the State of New Jersey, in which plaintiff Anderson's name has already been certified to appear on the ballot in the 1980 general election as an independent candidate for President of the United States. Plaintiff Eisenstat intends to cast his vote in the 1980 general election for the slate of electors pledged to plaintiff Anderson in New Jersey.

5. Defendant Anthony J. Celebrezze, Jr., is the Secretary of State of the State of Ohio. As such, he is charged by law with responsibility for the administration of elections in Ohio, including the procedures by which, among other things (i) nominating petitions filed by independent candidates for President and Vice–President are received by the State of Ohio and transmitted to the appropriate county Boards of Election of the State of Ohio for verification of the signatures contained therein, and (ii) the names of independent candidates who have been duly nominated for the offices of President and Vice–President are certified to all county Boards of Election for inclusion on the official ballot in the general election.

6. On April 24, 1980, plaintiff Anderson publicly announced his intention to pursue an independent candidacy for the office of President of the United States. At the same time, he publicly renounced his previously declared intention to seek the Republican Party's nomination for that office, although stating that he would remain a member of the Republican party, and filed with defendant Celebrezze a Notice of Withdrawal of Consent which resulted in his name being removed from the ballot of the Ohio Republican Party primary scheduled to be held on June 3, 1980.

7. The listing of plaintiff Anderson's name on the 1980 general election ballot will not be barred by the provisions set forth in the last sentence of Ohio Revised Code Section 3513.04.

8. Following plaintiff Anderson's announcement on April 24, supporters of his Presidential candidacy throughout the United States began making efforts intended to place his name as an independent candidate for President on the ballots of every state of the union in the November, 1980 general election.

9. Following plaintiff Anderson's announcement, a group of his supporters in Ohio began to secure the necessary signatures of registered Ohio voters to place plaintiff Anderson's name on the Ohio bal-

---

1. Some of the facts contained in this stipulation are in the peculiar knowledge of one party and have been provided to the other party; in these instances, the other party may have no independent knowledge of such facts but is agreeing not to contest them for the purposes of this action. For example, many of the facts describing the Anderson candidacy are not within the independent knowledge of the Secretary of State; they are, however, taken substantially verbatim from facts admitted into evidence in the record by a federal court judge at a trial conducted on June 6, 1980, *Anderson, et al. v. Bolger, et al.*, Civil Action No. 80–0340, E.D. N.Y.

lot in the 1980 general election as an independent candidate for President. Between May 10 and 15, 1980, supporters of plaintiff Anderson secured approximately 16,000 signatures of persons purporting to be Ohio registered voters. Under Ohio law, 5,000 valid signatures are required.

10. On May 16, 1980, supporters of plaintiff Anderson presented to the Secretary of State (i) a Statement of Candidacy by plaintiff Anderson, (ii) Nominating Petitions containing approximately 14,500 signatures of persons purporting to be eligible Ohio voters, (iii) a full slate of candidates for Presidential electors, including the name of plaintiff Hetrick, pledged to support the candidacy of plaintiff Anderson, and (iv) payment of $100 as filing fees for candidates for President and Vice–President. All of the materials described above in this paragraph which were tendered to defendant on May 16, 1980, including a certificate of candidacy bearing plaintiff Anderson's original signature, are contained in a box under seal dated June 7, 1980, and initialed by counsel for the parties herein.

11. Plaintiff Anderson's Statement of Candidacy and Nominating Petition would have been accepted for filing but for the fact that they were not filed within the time required by Ohio Revised Code Section 3513.257.

12. Defendant Celebrezze, to whom the foregoing papers were tendered, failed and refused to accept the Statement of Candidacy, Nominating Petitions, slate of candidates for Presidential Electors, and filing fees on the sole ground that they were not timely filed under Section 3513.257. At the time the supporters of plaintiff Anderson tendered the papers, they received a letter from the Secretary of State, a true, accurate, and authentic copy of which is attached hereto as Exhibit "A."

13. The results of several recent public opinion polls conducted by nationally recognized polling organizations are reported in the attached exhibits:

*Exhibit B :*

An ABC News–Harris Survey poll conducted during the period April 26–30 which was broadcast on national network television news and reported in many newspapers;

*Exhibit C :*

A Yankelovich, Skelly and White, Inc. survey poll conducted between May 14 and May 16, 1980 for TIME Magazine which was published in the June 2, 1980 edition of Time and elsewhere;

*Exhibit D :*

A Field Poll, conducted in mid–May in California, reported in the *New York Times* and elsewhere;

*Exhibit E :*

An Associated Press–ABC News "Exit Poll" conducted on June 3, 1980 in which major party voters who voted in the primaries in Ohio, California and New Jersey were interviewed as they left the polling place, reported on ABC national network television news and on the AP "A" wire;

*Exhibit F :*

A *New York Post* poll, conducted beginning May 17, and reported in the *New York Post* on June 6, 1980.

14. During his campaign for the Republican party nomination for President, plaintiff Anderson qualified for federal matching funds by raising the minimum required amount of money ($2000) in each of 10 states from the required number of contributors. Prior to April 24, 1980, he raised a total of $3,908,571 of private contributions, and $40,469 from duly registered political action committees which, with matching funds of $2,680,347, amounted to $6,629,387. Plaintiff Anderson spent all but $307,000 of his federal matching funds, which sum was returned to the Federal Election Commission when he ended his Republican campaign. Prior to April 24, Congressman Anderson was on the ballot in nine Republican primaries where he received percentages of the vote ranging from approximately 9% in Georgia and Florida to approximately 31% in Massachusetts and 37% in Illinois. In addition, he had an active campaign organization in a number of states in which delegates were chosen other than by primary. In total, he had acquired 55 delegates.

15. In addition to their efforts in Ohio, supporters of plaintiff Anderson have, since April 24 and as of June 9, gathered the requisite number of signatures (if valid) in ten states to place plaintiff Anderson's name on the ballot as an independent candidate for President. Campaign workers, paid and volunteer, have participated in these petition drives, and over 300,000 persons have signed the petitions in these states and others where petition drives are ongoing. The following is a brief summary of the petition activity as of May 30, 1980:

| State | Date Signatures Were Filed | Number of Signatures Required | Approximate No. of Signatures Actually Filed |
|---|---|---|---|
| New Jersey | 4/23/80 | 800 | 4,000 |
| Michigan | 5/05/80 | 18,339 | 62,252 |
| Massachusetts | 5/06/80 | 39,245 | 101,000 |
| Utah | 5/12/80 | 300 | 2,000 |
| North Carolina | 5/15/80 | 10,000 | 27,003 |
| Ohio | 5/16/80 | 5,000 | 14,500 * |
| Kentucky | 5/27/80 | 5,000 | 8,600 |
| Kansas | 5/21/80 | 2,500 | 6,000 |
| 8 States | ---- | 81,184 | 225,455 |

* Petitions tendered but refused by Secretary of State.

In addition, by June 9, Anderson supporters had gathered more than the required number of signatures (if valid) in Maine (minimum of 4,000 and maximum of 6,000 required; 8,000 collected, 5900 to be filed on June 9), New Mexico (17,274 required; over 32,000 gathered) and West Virginia (7,510 required; 11,159 filed).

16. Additionally, plaintiff Anderson's campaign currently has active petition drives underway in Wisconsin, Illinois, Georgia, Idaho, Maryland, Missouri, Oklahoma, Texas, and Nevada.

17. The campaign intends to try to obtain and file the requisite number of signatures to qualify for the ballot in all the remaining jurisdictions in the United States as quickly as possible.

18. Plaintiff Anderson has filed suit in federal court in Kentucky challenging the constitutionality of that state's deadline. In addition to Ohio and Kentucky, the Anderson campaign intends to institute or participate in litigation challenging pre–April 24 filing deadlines in each of the three other states which have such deadlines, if necessary to seek to place plaintiff Anderson's name on the ballot in those states. In addition, Anderson has participated in a suit in the Supreme Court of West Virginia challenging that state's geographical distribution requirements for petition signatures, and in litigation instituted in federal court in the Eastern District of New York claiming that the extension by Congress of a lower postal rate for bulk third–class mail to the Democratic and Republican parties but not to plaintiff Anderson's campaign is unconstitutional.

19. Between April 24, 1980 and June 3, 1980, in a period of five weeks, the National Unity Campaign for John Anderson has raised over $1,300,000 in private contributions from all 50 states and the District of Columbia in amounts of $1,000 or less (as required by law) from over 40,000 individual contributors.

20. Between April 24, 1980 and June 3, 1980, the campaign has established 63 offices in 35 states. New offices are being established daily, and in the next 30–60 days the campaign anticipates that it will have offices open in all 51 jurisdictions. The campaign currently employs approximately 150 people in the National headquarters in Washington and in other offices throughout the country with a monthly payroll of approximately $100,000. Additionally, the campaign has signed a nationwide phone agreement with the Illinois Bell Telephone Company to provide the campaign efficient telephone service in all 51 jurisdictions. The sum of $150,000 has been deposited in the D.C. National Bank in an irrevocable letter of credit, from which Illinois Bell covers the campaign's various deposit and installation costs.

21. After the March 20 filing deadline specified by Section 3513.257 and until shortly after the June primary, Ohio law does not impose upon the Secretary of State or his agents, and he or his agents do not undertake, any administrative tasks with respect to filed nominating petitions for independent candidates.

22. On June 8, 1979, Plaintiff Anderson declared his intention to seek the nomina-

tion of the Republican Party for President of the United States.

23. For nearly twenty years, plaintiff Anderson has served as a Republican member of the U. S. Congress from Illinois' 16th Congressional District. He is serving in his tenth term as a Member of Congress from that district, having run for and been elected as a Republican every two years beginning in 1960. In 1956, he ran as a Republican for, and was elected to office as, Winnebago (Illinois) County State's Attorney. He had never sought elective office as an independent prior to April 24, 1980, and he has never sought elective office as the candidate of any political party other than the Republican Party.

24. Prior to April 24, 1980, plaintiff Anderson's name appeared or was scheduled to appear on the ballots of 27 of the 36 states that hold Republican primary elections. Nine of these primaries were held prior to April 24. Plaintiff did not win any of these nine primaries. In 8 of these 9 primaries in which delegate votes were awarded, plaintiff received 55 of the 356 delegates awarded, 26 of which were in his home state. This was 28% of the delegates awarded in his home state. Attached hereto as Exhibit G is a chart showing pre–April 22 primary results. The only additional primary prior to April 24 was that of Pennsylvania, in which Anderson was not entered and in which 83 delegates were awarded.

25. Supporters of Plaintiff Anderson for the Republican nomination for President engaged in at least some activity in support of his candidacy in the remaining 14 states which select delegates to the Republic National Convention by caucus or convention.

26. After plaintiff Anderson determined to run for President as an independent on April 24, 1980, his name appeared on the Republican primary ballot for President in twelve states and the District of Columbia. In five states where his name had been scheduled or certified to appear, his name was withdrawn from the ballot prior to the Republican primary election.

27. In order to qualify as a Presidential candidate in the Republican primaries for the states listed below, Plaintiff Anderson had to obtain sufficient signatures on petitions. The signatures were obtained during the time periods indicated in the number indicated and filed on the date indicated.

| State | No. of Signatures | Time Period During Which Gathered | Date Filed |
|---|---|---|---|
| New Hampshire | about 1,500 | one month | late Dec. 1979 |
| Illinois | about 15,000 | one month or less | Dec. 31, 1979 |
| Vermont | about 300 | two weeks | Feb. 12, 1980 |
| Indiana | 7,517 | two weeks | March 7, 1980 |
| Montana | about 4,000 | two weeks | March 15, 1980 |
| Ohio | about 7,350 | March 13–20, 1980 | March 20, 1980 |

28. Plaintiff Anderson gathered approximately 16,000 signatures in 86 of Ohio's 88 counties during a five–day period from May 10 to May 15, 1980 in an effort to file nominating petitions to run for President as an independent.

29. Ten of the twenty–two persons coordinating plaintiff Anderson's candidacy as an independent for President in Ohio performed similar functions in connection with his Republican candidacy for President in Ohio, including Diane Hetrick who is now his Ohio Coordinator and was his Southern Ohio Coordinator when he was a Republican candidate, William Massuros who is now his Ohio Field Coordinator and was a Traveling Coordinator when he was a Republican candidate, and Eric Brass who is now a Cincinnati Coordinator and was a Traveling Coordinator when he was a Republican candidate.

30. In 1980, five candidates submitted sufficient signatures, if determined valid, to qualify as independent candidates for President of the United States:

| Candidate | No. of Signatures Filed | Date of Filing |
|---|---|---|
| Richard E. Congress | 11,022 | 12/18/79 |
| Deirdre Griswold | 10,001 | 3/13/80 |
| Ed Clark | 9,944 | 3/18/80 |
| Gus Hall | 9,730 | 3/19/80 |
| Barry Commoner | 10,331 | 3/20/80 |

Gus Hall has already been determined not to qualify for the ballot because not one of his certificates of candidacy contained his original signature, and the law requires at least one original signature on a certificate of candidacy.

31. In 1980, two candidates submitted sufficient signatures, if determined valid, to qualify as independent candidates for the United States Senate:

| Candidate | No. of Signatures Filed | Date of Filing |
|---|---|---|
| John E. Powers | 10,475 | 12/18/79 |
| Rick Nagin | 8,080 | 3/19/80 |

Rick Nagin has already been determined not to qualify for the ballot because not one of his certificates of candidacy contained his original signature, and the law requires at least one original signature on a certificate of candidacy.

32. In 1978, three independent candidates for the office of Governor filed timely nominating petitions and appeared on the general election ballot in Ohio.

33. In 1976, five independent candidates for President of the United States and three independent candidates for the United States Senate filed timely nominating petitions and appeared on the general election ballot in Ohio.

34. In 1974, one independent candidate for Governor and two independent candidates for the United States Senate filed timely nominating petitions and appeared on the general election ballot in Ohio.

35. In 1978, the number of votes cast for Governor in Ohio was 2,843,351.

36. In 1976, the number of votes cast for President of the United States in Ohio was 4,111,873, and the number of votes cast for United States Senator was 3,920,613.

37. In 1974, the number of votes cast for Governor in Ohio was 3,072,010, and the number of votes cast for United States Senator was 2,987,606.

38. Because records with respect to such matters are not kept and/or because such records cannot easily be obtained and analyzed, it is impossible to determine with any accuracy how many, if any, independent candidates for any office in Ohio either (i) filed and were rejected for any reason, or (ii) were deterred from seeking nomination by petition, through the procedures set forth by state law, in any given prior year.

39. The following is a description of the process through which candidates seeking the nomination of the Republican or Democratic party (or any third party candidate where the party has qualified under Ohio Revised Code Section 3517.01(A)) have their names appear on their respective party primary ballot and how the winners' names, along with the names of independent candidates, are placed upon the general election ballot:

1. Seventy five days prior to the primary election, all presidential candidates wishing to run as independents in the general election file their nominating petitions with the Secretary of State, while all presidential candidates wishing to run in a party primary have Declarations of Candidacy in Support of their Candidacy filed with the Secretary of State. The Declaration of Candidacy includes a petition which must be signed by one thousand registered electors who are members of the same political party as the proposed presidential candidate. These requirements are established by Ohio Revised Code Sections 3513.05, 3513.12 and 3513.257.

2. Upon the Secretary of State's receiving the Declarations of Candidacy, the part-petitions are separated by county and mailed to the respective county Boards of Election in order to have the signatures upon the petitions verified. It takes approximately three days to prepare and ship all petitions from the Secretary of State's office.

3. Since the county has to check each signature on every petition, the turnaround time is approximately five to eight working days.

4. The last day to file a Protest against a party candidate is sixty–five days prior to the primary election. Upon receiving a protest, the Secretary of State immediately fixes the time and place for a hearing. Notice of the hearing is sent to the candidate, the individual who filed the protest, and to all other interested parties. The hearing is conducted by the Secretary of State who must determine whether or not the Declaration of Candidacy is valid. His determination is final. Because of the deadlines for certifying the form of the ballot, the hearing and the rendering of a decision on a protest must be completed within two or three days of the filing of the protest.

5. Sixty days prior to the primary election, the Secretary of State is required to certify to the Boards of Elections the form of the official ballots for the primary election. In order to certify the forms of the ballots the Secretary of State's office must get the names of all candidates to the state printer. Since signature verification runs almost to the very day when the ballot form must be prescribed, the Secretary of State anticipates verification and begins work with the state printer in order to have galley proofs completed on or before the sixty–fifth day prior to the election. Proofing of the galley usually takes two to three working days, while printing of the final copy cannot be completed in less than three days. The entire process of getting the names of the candidates to the state printer, obtaining a galley proof of the proposed ballot, editing it and then having a finished printed sample ballot takes approximately ten working days.

6. During the time that the Secretary of State is certifying the presidential candidates' ballots, the Boards of Elections are obtaining bids from their printers on the proposed ballots. As soon as the official ballot are received from the Secretary of State's office, the Boards begin work on the rotation patterns. Most Boards are able to complete those within one or two days. As soon as a Board completes the rotation pattern, it sends the names of all the candidates within that county to its printer. It takes between eighteen to twenty–two days to receive the completed, printed ballot. The printer must prepare a galley proof and return it to the Board where it is edited. The Board also sends a copy of the galley to the Secretary of State for his approval. The galley must be checked for correct spelling of all candidate's names, for correct office and title designations, for correct print size and for proper rotation. It is rare when a Board can meet the statutory deadline (forty–five days prior to the election) for the mailing of absentee ballots. Normally absentee ballots are mailed seven to ten days late. It is important at this juncture to note that overseas absentee ballots must be mailed at least thirty days prior to the election in order for the voter to be able to vote the ballot and timely return it.

7. On the day that the ballots are delivered from the printer, a Board immediately begins setting its voting machines. In Franklin County, for example, seven crews are used full–time and they usually complete the tasks one or two days before the election. The voting machines must be pulled and the ballots inserted. The machines then are programmed to the appropriate ballot and the counters are all set back to zero. The machine is then locked and sealed. Election crews are restricted as to the number of voting machines they can process daily because many machines are stored in public buildings which close at 4:30 to 5:30 p. m. A crew can average fifteen to eighteen machines a day.

8. Immediately after the primary election, the nominating petitions for independent candidates for President and Vice–President are sent to the respective Boards of Elections for signature verification. Normally the petitions are mailed to the various Boards of Election on the Monday or Tuesday after the primary election. As in the case of Declarations of Candidacy, the signature verification process takes ap-

proximately five working days. All petitions must be open to inspection from June 15 to June 30. Protest against the nominating petitions may be filed up to and including the 30th day of July.

9. As soon as the names of all Presidential candidates are ascertained, which is no sooner than the completion of the nominating process at the Republican and Democratic national conventions, the official ballot is prepared by the Secretary of State and sent to the State printer. Thereafter, the presidential ballot is mailed to the Boards of Elections. From that time on, the process is identical to that established for the primary.

Attached hereto and incorporated herein as Exhibit H is the Ohio 1980 Election Calendar prepared for public distribution by the Ohio Secretary of State. [Ed. Note: Exhibit omitted from publication.]

Respectfully submitted,
Attorneys for Plaintiffs

James E. Pohlman, Trial Attorney
PORTER, WRIGHT, MORRIS & ARTHUR

OF COUNSEL:
PORTER, WRIGHT, MORRIS & ARTHUR

Mitchell Rogovin, Trial Attorney
George T. Frampton, Jr., Trial Attorney
ROGOVIN, STERN & HUGE

OF COUNSEL:
ROGOVIN, STERN & HUGE

Attorneys for Defendant

WILLIAM J. BROWN
Attorney General

Joel S. Taylor, Trial Attorney
Deputy Chief Counsel

Adrienne C. Lalak
Assistant Attorney General