Bruce BRADLEY et al., Plaintiffs,

v.

Marvin MANDEL et al., Defendants.

Civ. A. No. T–76–638.

United States District Court,
D. Maryland.

Argued March 23, 1978.

Decided May 4, 1978.

James D. Pembroke, Washington, D. C., James M. Smith, Gebhardt & Smith, Baltimore, Md., Jon T. Brown, Duncan, Brown, Weinberg & Palmer, Washington, D. C., P.C., for plaintiffs.

Robert A. Zarnoch, Asst. Atty. Gen. of Maryland, Baltimore, Md., Francis B. Burch, Atty. Gen. of Maryland, and George A. Nilson, Deputy Atty. Gen. of Maryland, Baltimore, Md., for defendants.

Before WINTER, Circuit Judge, THOMSEN, Senior District Judge, and KAUFMAN, District Judge.

WINTER, Circuit Judge:

This case is before us again on remand from the Supreme Court of the United States. *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). The Supreme Court construed our previous unreported opinion as placing excessive reliance on the summary affirmance in *Tucker v. Salera,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), *affirming,* 399 F.Supp. 1258 (E.D.Pa.1975), ruling that summary affirmance is an affirmance of the judgment only and not necessarily of the rationale of decision of the court, the judgment of which is summarily affirmed. Accordingly, it vacated our judgment, which had invalidated the filing deadline of Article 33, § 7–1(i), of the Annotated Code of Maryland (1977 Cum.Supp.),* as applied to an

---

* All statutory references are to Article 33 of the Annotated Code of Maryland (1976 Repl.Vol. and 1977 Cum.Supp.). Some section numbers have been changed in the 1977 Cumulative Supplement, but without material change in their substantive context. As a consequence,

independent candidate for a statewide office in a *presidential* primary year, and remanded the case to us for "an independent examination of the merits," 432 U.S. at 177, 97 S.Ct. 2238 at 2241, 53 L.Ed.2d 199, applying the test articulated in *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). In essence, *Storer* prescribes as a test of constitutional validity whether, under the challenged requirements, "a reasonably diligent independent candidate [can] be expected to satisfy the [ballot access] requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742, 94 S.Ct. at 1285. Specifically, we were directed:

1. To "sift through the conflicting evidence and make findings of fact as to the difficulty of obtaining signatures in time to meet the early filing deadline." 432 U.S. at 178, 97 S.Ct. at 2241.

2. To consider "the extent to which other features of the Maryland electoral system—such as the unlimited period during which signatures may be collected, or the unrestricted pool of potential petition signers—moderate whatever burden the deadline creates." *Id.*

3. To analyze "the past experience of independent candidates for statewide office" to determine what that experience might "indicate about the burden imposed on those seeking ballot access." *Id.*

4. To consider whether Maryland's " 'technical and administrative requirements governing the petition signing process' are an unconstitutional burden on ballot access." 432 U.S. at 179 n.5, 97 S.Ct. at 2242.

The parties have amplified the record of the previous trial by additional affidavits and stipulations. We make the findings of fact which follow on the basis of the record as so amplified.

the references to specific sections in this opinion may differ from those in our previous opin-

*General*

What we are concerned with in the present case is whether an independent candidate for statewide office in a *presidential* election year is unconstitutionally burdened by the requirement of Maryland law that his nominating petition be validly signed by at least 3% of Maryland's registered voters and be filed approximately 230 to 240 days before the general election. § 7–1(b) and (i). The issues for our decision arise from the following requirements of Maryland law and the following facts.

Maryland permits an independent candidate to obtain a place on the general election ballot by filing a nominating petition signed by not less than 3% of the registered voters who are eligible to vote for the office for which he seeks nomination. § 7–1(b). Any nominating petition must be filed "not later than 9:00 p. m. on the Monday which is ten weeks or 70 days before the day on which the primary election should be held . . . ." § 7–1(i). Primary elections are fixed by Maryland law to be held on the second Tuesday after the first Monday in September in any year in which there shall *not* be a presidential election; and in any year in which there shall be a presidential election, the primary election shall be held on the third Tuesday in May. § 5–2. The net result of combining these various provisions is that *in years of presidential elections,* independent candidates must file their nominating petitions early in March, approximately 230 to 240 days before the general election. In non-presidential election years, independent candidates must file their nominating petitions by late June, approximately 120 days before the general election.

Plaintiff Bradley sought to be an independent candidate for United States Senator in 1976. Under Maryland law, his nominating petitions were required to be filed on March 8, 1976, and to bear, in the aggregate, 51,155 valid signatures of registered

ion and the opinion of the Supreme Court.

voters eligible to vote in his election. Although he filed petitions by March 8 bearing 53,239 signatures, only 42,049 signatures were determined to be valid. This suit ensued based upon two principal contentions: (1) that the early filing date for nominating petitions unduly burdened Bradley's access to the ballot and the right of his supporters to vote for him, and (2) that the various Maryland requirements governing the validity of signatures, under which approximately 9,000 signatures were disqualified, also constituted an unconstitutional burden on ballot access. After interim relief and our previous decree, Bradley gathered the requisite number of signatures, obtained a place on the ballot and lost the election.

We turn then to the areas of inquiry specified in the opinion and mandate of the Supreme Court.

*Findings with Regard to the Difficulty of Obtaining Signatures to Meet the Early Filing Deadline*

■ From the evidence before us, some of which is contradicted, we find that the early filing deadline imposed substantial burdens on Bradley's candidacy.

We find that it was difficult for Bradley and his campaign manager to recruit volunteers for the campaign of gathering signatures to the nominating petitions since few persons could feel the immediacy of collecting signatures in the fall and winter of 1975 for an election to be held in November 1976. Indeed, during the signature-gathering period, three petition drive chairpersons, two schedulers, and five county chairpersons were recruited and lost. They quit because of the frustrations of expending a large effort in a political campaign during a period of time remote from the actual election. Another factor in their decision was the pressure of conducting a petition drive in adverse winter weather conditions.

Adverse winter weather conditions also made it difficult to obtain signatures to nominating petitions. Potential signers were not disposed to remain out of doors and accede to political solicitation at shopping centers, shopping malls and the other public places which were the logical places to collect signatures.

We find that the early filing date made it extremely difficult for Bradley to attract coverage from the news media, both electronic and printed. When media coverage was requested, the usual response was that the Bradley campaign would be reported along with the primary campaign—a time which occurred largely after the filing deadline for nominating petitions. The lack of news media coverage damaged the Bradley campaign in its fund raising efforts, demoralized its campaign staff, and resulted in a lack of voter knowledge of or interest in the candidate and his campaign.

We find further that the campaign for signatures was unduly burdened by the requirement that it be conducted before campaigns for primary elections had begun in earnest and the issues which emerge from primary campaigns had been developed. Stated otherwise, there was a burden in seeking to attract signers of nominating petitions when they did not know who were the candidates in the primary elections of the regular political parties and the issues which emerge from primary contests.

We find also that the early filing deadline unduly burdened Bradley's ability to raise money to finance his campaign to obtain signatures. Again, the burden resulted from the requirement that the signature campaign be carried on before the filing date for candidates in the primary election and, hence, before the candidates in the primary elections and the issues developed as a result of the primary campaigns were known. With so many factors still uncertain, potential donors were naturally reluctant to make campaign contributions.

The burdens placed on the Bradley campaign with respect to media coverage extended also to Bradley's efforts to make himself known by appearing before civic and other groups in the winter of 1975–76. The vast majority of such groups before which Bradley sought to appear indicated that they would permit him to speak only

during the political meetings and "candidates' nights" which they had scheduled during the months of March, April and May, 1976. Thus, Bradley would have been permitted to appear before such civic and other groups only after the filing deadline for nominating petitions had passed.

In opposition to Bradley's evidence, the defendants did submit the affidavit of Professor Smolka, a professor of political science at American University, Washington, D.C. Professor Smolka expressed the view that the extension of the deadline for filing petitions of candidacy beyond the date for a primary election might work to the disadvantage of an independent candidate because the views of voters who had voted in primary elections tend to become fixed and they are less likely to sign a nominating petition. Professor Smolka also expressed the opinion that a candidate by petition under existing law has an advantage over a primary candidate because (a) the petition candidate is not required to defeat a particular opponent, (b) he needs fewer signatures than the votes needed by a primary candidate to get on the ballot at the general election, (c) the petition candidate has a longer period in which to garner signatures, and (d) a signer of a petition need not commit his vote. We have considered Professor Smolka's views, but we think that they are more theoretical than real. The fact that Bradley was successful in obtaining the requisite number of signatures when we extended the signature-gathering period beyond that prescribed by existing law disproves many of them. Accordingly, we make the general and specific findings of substantial burden before stated in this section of our opinion.

### Moderating Factors of Maryland's Electoral System

In its opinion in the instant case, the Supreme Court has suggested that such features of the Maryland Electoral System as the unlimited period during which signatures may be collected, or the unrestricted pool of potential petition signers, may moderate the burdens which we have found

that the early filing deadline creates. The defendants have also suggested the requirement that only 3% of the registered voters eligible to vote for the office which an independent seeks is a moderating influence, stressing that that figure is substantially less than the maximum which has been found constitutionally valid by the Supreme Court. The defendants point out further that in Maryland signers of a nominating petition are not required to state their intention to vote for the candidate, petitions may be circulated by non-residents and persons not registered to vote in Maryland, and Maryland's liberal registration by mail statute permits a worker for an independent candidate simultaneously to approach signators and furnish them with a registration by mail form which need only be completed and mailed to complete registration.

Of course, we view all of the provisions of Maryland law identified by the Supreme Court and by the defendants as ones diminishing the burden on an independent candidate who seeks to appear on the ballot at the general election by means of nominating petitions. But we are unable to see how any of these provisions actually ameliorates the major defect of the Maryland scheme: viz. that the remoteness of the filing date makes it impossible to generate interest on the part of workers and the electorate in the candidacy of the independent and to generate the publicity, campaign funds, and interest which must be generated even to accomplish the moderate requirement of obtaining the signatures of only 3% of the registered voters eligible to vote for the office that the independent candidate seeks. Overall, we do not find any moderating factors which remove or significantly ameliorate the substantial burden of Maryland's early filing date for independent candidates.

### Past Experience of Independent Candidates for Statewide Office

Prior to amendments made to the Maryland Election Law in 1969 and 1970, Maryland had no presidential primary. There is

therefore no experience of independent candidates for statewide office prior to those dates who were required to file nominating petitions by the filing date which Bradley challenges. In the pre-1969 period, independent candidates for statewide office were not required to file nominating petitions until mid-summer. It is of interest that in 1968 both George Wallace, an independent candidate for President, and George P. Mahoney, an independent candidate for the United States Senate, both sought and obtained the requisite number of signatures (3% of 1,397,852, or 41,936) by the end of July of that year. Indeed, Wallace obtained 58,271 valid signatures and Mahoney obtained 62,542.

In the post-1969–70 period, there is no proof of whether or not there were any independent candidates in 1970, and the proof shows that there were none in 1972. In 1974, a nonpresidential year, 10 independent candidates sought nomination by petition but all sought to be nominated to something other than statewide office.** Eight of the 10 were successful in getting the requisite number of valid signatures by the filing date; and of the 8, three were candidates for the State Senate and 5 were candidates for the State House of Delegates. One candidate for the United States House of Representatives and 1 for the State House of Delegates were unsuccessful petition candidates.

In the 1976 election in which Bradley sought to run, there were 4 other independent candidates: 3 for the United States House of Representatives, and 1 for President. Two of the 3 candidates for House of Representatives obtained the requisite number of signatures by the requisite filing date; the third obtained them within the extended filing deadline that we had prescribed for Bradley. The presidential candidate (Eugene McCarthy), although afforded the same extended deadline as that prescribed for Bradley, was not successful in filing the requisite number of valid signatures.

** There was no proof before us of any independent candidates who may have sought office in County or City elections in any year. The only

The statistical sample that the experience in 1974 and 1976 comprises is too small to permit us to draw firm conclusions. With respect to the experience in 1974, we are bound to notice, however, that the requisite number of valid signatures which the successful petitioning candidates were required to produce varied from a low of 423 to a high of 1,376, since all of the successful candidates were running for less than statewide office. In our view, the high degree of success of independent candidates in 1974 (8 out of 10), is no reflection of the likelihood that Bradley, who was required to produce 51,155 valid signatures, could obtain the requisite number by the exercise of reasonable diligence. Even aside from the requirement as to the number of valid signatures, we think there are vast differences between an independent candidate for statewide office and one for less than statewide office with respect to media coverage, campaign costs, the need to make himself known, and the types of issues on which to campaign. To employ a common expression, one cannot compare apples with oranges.

Again with respect to 1976, the smallness of the statistical sample does not permit us to draw definitive conclusions. Nevertheless, we attach some significance to the fact that neither of the 2 candidates for statewide office in 1976 could obtain the requisite number of valid signatures by the requisite filing date, while 2 out of 3 candidates for less than statewide office met their burden. The significance of the 1976 experience is increased by the further facts that (a) Bradley met his burden when the signature gathering period was reasonably extended, and (b) the 2 statewide candidates in 1968 met their burden when, under the then law, their filing date was in July, 1968. To the extent that past experience proves anything, we think that it tends to prove that the early filing date which Bradley attacks substantially hindered his access to the ballot.

evidence related to those who ran for State or Federal office.

### Bradley As a Reasonably Diligent Candidate

■ Seizing upon the express condition in *Storer, supra,* defendants offered proof that Bradley's failure to meet the filing date prescribed by Maryland law is attributable to the fact that he was not a reasonably diligent candidate and that therefore the challenged filing date is not invalid under the *Storer* test. *Inter alia,* defendants proved that Bradley, after having obtained access to the ballot in the general election, not only lost the election but made a poor showing compared to other candidates. There was proof also that in 1975 and in 1976 to March 31 of that year, Bradley raised and spent substantially less than the two principal candidates for the Democratic nomination and the principal candidate for the Republican nomination. Finally, defendants stress that Bradley and his campaign organization ran a chaotic campaign, citing as a prime example that Bradley compensated signature gatherers on a per signature basis rather than a per *valid* signature basis.

We have no doubt that even Bradley, exercising hindsight, would have run his campaign differently in certain particulars. But having had Bradley and those who worked in his campaign testify before us, we cannot conclude that he was not a reasonably diligent candidate. As we have found, most of the difficulties in operating his campaign, including the recruitment of workers, the raising of funds, the obtention of news coverage, etc., resulted from the early filing date and not a lack of diligence. Bradley's lack of success in the general election is no measure of his lack of diligence in obtaining signatures. A better measure is the fact that he obtained the requisite number of signatures when he was given a reasonable extension of time in which to obtain them.

We find, therefore, that defendants have not sustained their defense and that Bradley was a reasonably diligent candidate.

### Conclusions Re Early Filing Date

■ We find that the early filing date substantially burdened Bradley's campaign for nomination by petition and his access to the ballot at the general election. The substantial burden of the early filing date is not ameliorated by other less stringent requirements of Maryland's petitioning process. We find that Bradley was a reasonably diligent candidate. In our previous opinion, we found, and we now reaffirm, that there is no validating state interest to justify the early filing date for independent candidates for statewide office in a presidential election year. We therefore conclude that, tested by the rule of *Storer,* § 7–1(i) unconstitutionally burdens access to the ballot, and the right of his supporters to vote for him, of an independent candidate for statewide office in a *presidential* election year. We will, therefore, grant a declaration of invalidity and grant a permanent injunction against the application of § 7–1(i) to this extent.

### Maryland's Technical and Administrative Requirements Governing the Petition Signing Process

■ We think that little discussion is required to show that Maryland's technical and administrative requirements governing the petition signing process do not constitute an unconstitutional burden on access to the ballot.

Bradley contends that the totality of the early filing date and the following provisions of § 7–1, the manner in which they have been applied, and other provisions of Art. 33, unconstitutionally limit his access to the ballot:

### Nomination By Petition

§ 7–1. General provisions.

(c) *Form of petition; affidavit.*—The signatures shall not be appended to one paper but shall be on separate papers, bearing one or more signatures and being no more than 8½ inches in width or 14 inches in length. Such paper shall not contain the names of persons residing in more than one county or in any county and in the City of Baltimore. Each signer shall append to his signature his residence, and the name of the county or city where he is registered as a voter, and immediately

below the signature of any signer there shall be either printed or typed the name of the signer. Every paper shall be accompanied by an affidavit or affidavits made before a notary public, or other officer authorized to take oaths under the laws of this State, by one or more persons known personally to the notary public or other officer, and so certified by him and signed by the affiants, to the effect that the signers are known to such affiant or affiants to be registered voters of the county or city as set forth in the petition, and that the affiant or affiants personally saw the signers, in regard to whom he or they make oaths, sign the paper.

(d) *Restrictions on signers.*—A person may not sign more than once for the same nominee for an office.

(e) *Submission of papers to county board.* —Any paper which is to form a part of a certificate of candidacy shall be submitted to the board for the county or the City of Baltimore in which the signers on the paper are alleged to reside. The board shall give to anyone submitting any such paper a signed receipt stating that the paper is on file with the board.

With respect to administration, Bradley complains that a married woman is required to sign her Christian name—the name by which she is registered as a voter—to constitute a valid signature. He also complains of a lack of uniformity in the administration of § 7–1 by the various boards of election. He argues that a voter in a metropolitan area may not know the county or city in which he is registered. He asserts that many jurisdictions, as a matter of administrative practice, purge the registration lists, pursuant to § 3–20, at or shortly before the filing date that he was required to meet, thus causing confusion as to who is eligible to sign; and that he was hampered by the lack of any mechanism under Maryland law whereby he could obtain a declaration of the validity of signatures which he had gathered before the filing date.

We are not persuaded that § 7–1, et al. in these various particulars substantially hindered Bradley's access to the ballot. First, notwithstanding them, Bradley obtained a very substantial number of valid signatures before the filing date; he obtained more than the requisite number when we required the filing date to be extended. It was the early filing date, not technical or administrative requirements, which caused his initial disqualification. Second, and more importantly, we perceive as a justification for most of these restrictions Maryland's legitimate interest in providing for efficient administration of the petitioning process and the prevention of election frauds. Thus, unlike the early filing date, important State interests require—to name a few—a signer to sign in the name by which he or she is registered, that only voters registered in a single jurisdiction sign on the same sheet so as to facilitate validation, that registration lists be purged from time to time to eliminate voters who have died or moved. While such requirements present some burden, that burden is greatly outweighed by the proper objectives they are tailored to achieve.

Our declaration of invalidity and the injunction we will grant will be limited to the early filing requirement for independent candidates for statewide office in presidential election years as contained in § 7–1(i).

We request counsel promptly to agree upon a form of order to effectuate the views we have expressed.