John B. ANDERSON;  D. A. Bert Booth;
Kevin P. McCleaf;  Gerald M. Eisenstat

v.

Willard A. MORRIS, State Administrator
of the Election Laws;  Theodore N.
Clark, Chairman of the State Adminis-
trative Board of Election Laws;  James
W. Johnson, Vice–Chairman of the State
Administrative Board of Election Laws;
Reginald A. Asplen, Member of the
State Administrative Board of Election
Laws;  Karen Lancaster, Member of the
State Administrative Board of Election
Laws;  Sylvia Raphael, Member of the
State Administrative Board of Election
Laws;  State Administrative Board of
Election Laws.

Civ. No. Y–80–1632.

United States District Court,
D. Maryland.

Aug. 6, 1980.

On Motion for Attorneys' Fees and
Costs Nov. 19, 1980.

Henry R. Lord, Michael C. Powell and Thomas J. Gisriel, Baltimore, Md., and Mitchell Rogovin, George T. Frampton, Jr., and Ellen S. Semonoff, Washington, D.C., for plaintiffs.

Stephen H. Sachs, Atty. Gen., George A. Nilson, Deputy Atty. Gen., Diana G. Motz, and Robert A. Zarnoch, Asst. Attys. Gen., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

John B. Anderson, Independent candidate for President of the United States, has filed suit against Maryland election officials challenging the constitutionality of state laws which prevent him from being on the general election ballot. Joining him as plaintiffs are D. A. Bert Booth, a registered voter in Maryland who wishes to vote for Anderson, Kevin P. McCleaf, a Maryland registered voter and elector pledged to Anderson, and Gerald M. Eisenstat, a registered voter in the State of New Jersey who intends to vote for Anderson. Cross motions for summary judgment have been filed based on a joint stipulation of facts submitted by the parties. For reasons stated below, judgment will be entered for the plaintiffs. Because the Court finds the burdens on plaintiff Anderson's rights to be an adequate basis for its decision, no separate consideration has been given to the claims by the other plaintiffs.

I. *THE FACTS*

On June 8, 1979, plaintiff Anderson declared his candidacy for the Republican Party nomination for President. By letter of March 4, 1980, Maryland Secretary of State Fred L. Wineland notified the plaintiff that, pursuant to Ann.Code of Maryland, Article 33, § 12–2(a)(1), Anderson's name would be placed on the Republican primary ballot in Maryland unless prior to

March 21 the plaintiff filed an affidavit stating he was not a candidate for the nomination.[1]

On April 24, 1980, the plaintiff publicly announced that he would pursue his candidacy for the presidency as an Independent. At the same time, he renounced his previously declared intention to seek the Republican Party's nomination for that office, although stating that he would remain a member of the Republican Party. He also notified Maryland Secretary of State Wineland of his withdrawal. On April 28, Secretary of State Wineland informed Anderson that his name would remain on the ballot, because the plaintiff had not withdrawn from the race before the deadline specified by law (March 21). Article 33, § 12–2(a)(4).

Following Anderson's announcement, a group of his supporters in Maryland began efforts to secure the necessary signatures of registered voters to place his name on the general election ballot as an Independent candidate for President. Between May 19 and July 7, 1980, Anderson supporters gathered approximately 89,019 signatures of persons purporting to be Maryland registered voters and submitted them to local boards on July 8, 1980. Under Maryland law, 55,517 valid signatures must be submitted (three percent of all registered voters in the state); one third must be submitted by March 3, 1980, while the remainder are due August 4.[2] Article 33, § 7–1. Maryland law also requires that an Independent's certificate of candidacy be filed by March 3–the date most candidates for primary elections must file.[3] Article 33, § 4A–3.

The defendants, who are responsible for administering Maryland's election laws, will not place plaintiff Anderson's name on the general election ballot on the grounds that a certificate of candidacy and a sufficient number of signatures were not filed timely by the March 3 deadline, as required by Article 33, § 7–1. It is conceded, however, that Anderson is qualified as a person who "may be nominated by petition" pursuant to Article 33, § 7–1(a). It is further conceded that the so–called "sore loser" provision, which keeps primary election losers off the general election ballot, does not apply to presidential elections.[4]

---

1. Article 33, § 12–2(a)(1) provides as follows:

   (a) *Manner of becoming candidate for nomination for President; procedure for casting votes as uncommitted; withdrawal of candidacy.* Whenever a party uses a primary election to nominate a candidate for President of the United States, any person who desires to run in the primary election may become a candidate for nomination only:

   (1) By direction of the Secretary of State who shall place the name of the candidate upon the ballot no sooner than 70 days nor later than 53 days preceding the date set by law for the primary election when he has determined in his sole discretion that the candidate's candidacy is generally advocated or recognized in the news media throughout the United States or in Maryland, in accordance with the national party rules, unless the candidate executes and files with the Secretary of State an affidavit stating without qualification that he is not and does not intend to become a candidate for the office in the Maryland primary election;

   \*   \*   \*   \*   \*   \*

2. The first deadline is determined from the date of the primary election (seventy days before), Article 33, §§ 7–1(c)(1) and 4A–3, while the latter date is set as the first Monday in August. Article 33, § 7–1(c)(2). Thus, in a non–presidential election year, when the primary is held in September, the first deadline would be considerably closer to the general election.

3. As indicated earlier, presidential candidates who are determined by the Secretary of State to be generally recognized as such in the media appear on the ballot without any action on their part. Instead, they are notified that they will appear on the ballot unless they file an affidavit by a set deadline stating that they are not candidates. Article 33, § 12–2(a), *supra*, note 1.

4. Article 33, § 8–2(a) provides:

   § 8–2. NAME OF DEFEATED PRIMARY CANDIDATE NOT TO BE PRINTED ON GENERAL ELECTION BALLOT.

   (a) No person who has been defeated for the nomination for any office in a primary election, except a candidate for the office of judge, and except as provided in subsection (b) below, shall have his name printed on the ballot at the succeeding general election as a candidate for any office. Nothing in this subsection shall be interpreted as being applicable to candidates for nomination of their party for President of the United States who have been defeated in a Presidential preference primary election.

The stipulated facts relating to the standing of candidate Anderson in the national political polls and relating to his campaign efforts make it clear that the plaintiff is a non–frivolous candidate for the presidency with a chance of influencing the outcome of the election.

The plaintiff's motion for summary judgment argues both that Maryland's requirements discriminate unconstitutionally against independent candidates, and that freedom of association is restricted unconstitutionally.

Federal courts in other states have struck down early filing deadlines upon challenges by plaintiff Anderson. In *Anderson v. Celebrezze,* 499 F.Supp. 121 (S.D.Ohio 1980), the court found that a March 20 deadline affected fundamental rights and was not justified by any compelling state interest. Likewise, the court in *Anderson v. Hooper,* No. 80 432–M Civil (D.N.M., July 8, 1980), found that a March 4 deadline discriminated against Independent candidates. Both states had "sore loser" statutes, but, for different reasons, the statutes did not apply to Anderson under the circumstances.

## II. *BASIC EQUAL PROTECTION ANALYSIS*

█ It has been held that the right to associate for political beliefs, and the right to cast one's vote effectively "rank among our most precious freedoms." *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). It is clear that such rights are at stake in this case, since Maryland law prevents a candidate from appearing on the ballot, and prevents voters from effectively voting for that candidate.[5] It is also clear that Maryland treats Independents differently than it treats party candidates with respect to these rights. State law requires petitions with the requisite number of signatures for an Independent candidacy, while no petitions are required

for a party nominee. Article 33, § 7–1. The law discriminates further with respect to presidential candidates in that an Independent seeking to be placed on Maryland's general election ballot must file his certificate of candidacy in early March, Article 33, §§ 7–1 and 4A–3, although in theory a party nominee could be placed on the ballot without having been a candidate at that time. Maryland law does not require the State Administrative Board of Election Laws to certify party nominees to the local boards until late August. Article 33, § 8–4. "Based upon past experience, the names of the Democratic and Republican nominees are generally transmitted to the State Board a week after the respective National Conventions." Stipulation 40. Thus, a party candidate might not have to join the race until his party's convention, less than three months from the general election, while an Independent must do so eight months ahead. The defendants argue strongly that in the current primary system, as a practical matter, a party candidate must join the race at least a year in advance. While this has certainly been the general practice, it is not required by Maryland law, and it is the requirements of Maryland law which are before the Court at the present.

It has been stated by the Supreme Court that:

> In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that "only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP v. Button,* 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405] (1963).

*Williams v. Rhodes, supra,* at 31, 89 S.Ct. at 11. Furthermore, even where there is a

---

5. While the plaintiff could mount a write in campaign, Article 33, §§ 4D-1 and 16–3(b)(3), it has been observed that "the realities of the electoral process . . . strongly suggest that 'access' via write–in votes falls far short of access in terms of having the name of the

candidate on the ballot." *Lubin v. Panish,* 415 U.S. 709, 719 n.5, 94 S.Ct. 1315, 1321, n.5, 39 L.Ed.2d 702 (1974); *see also Williams v. Rhodes, supra,* at 37, 89 S.Ct. at 13 (Douglas, J., concurring).

compelling state interest involved, it has been required "that States adopt the least drastic means to achieve their ends." *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979). Accordingly, the Court will apply a two-part analysis to the restrictions involved here: First, is there a compelling state interest which justifies that kind of restriction? Second, is the restriction the least drastic means available to achieve that interest?

The defendants here, as the defendants in the Ohio case, argue that *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), and *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), have changed the law on equal protection analysis. The Court recognizes that language in both cases, taken out of context, creates some confusion. The Supreme Court in *Storer* made the following comments which might be interpreted as requiring a balancing test as the first step of the analysis:

. . . the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a "matter of degree," *Dunn v. Blumstein, supra* [405 U.S.], at 348 [92 S.Ct. 995, at 1006, 31 L.Ed.2d 274], very much a matter of "consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Williams v. Rhodes, supra* [393 U.S.], at 30 [89 S.Ct. at 10]; *Dunn v. Blumstein, supra*, [405 U.S.] at 335 [92 S.Ct. at 999]. What the result of this process will be in any specific case may be very difficult to predict with great assurance.

*Storer v. Brown, supra*, 415 U.S. at 730, 94 S.Ct. at 1279. In remanding a case for further proceedings in *Mandel*, the Supreme Court instructed the lower court to make the following inquiry, citing *Storer* as the source of the standard:

█n the context of [Maryland] politics, could a reasonably diligent independent candidate be expected to satisfy the [ballot access] requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not. We note here that the State mentions only one instance of an independent candidate's qualifying . . . but disclaims having made any comprehensive survey of the official records that would perhaps reveal the truth of the matter.

*Mandel v. Bradley, supra*, 432 U.S. at 177–178, 97 S.Ct. at 2241.

█ It is argued that these cases require as an initial inquiry by this Court a determination of whether a "reasonably diligent independent candidate" could satisfy the Maryland requirements. The Court rejects this contention. While the extent of the burden must be balanced against the state interest involved at a later point in the analysis, this is not the initial inquiry. Having determined that fundamental rights are being burdened, the first question is whether there is a compelling state interest which might justify these burdens. In other words, *Storer* and *Mandel* do not relieve the state of the burden of showing some compelling state interest which may justify the restrictions. Only after the Court is satisfied that such a compelling interest exists will it reach the issue of how drastic the restrictions are—that is, could a reasonably diligent candidate comply? To accept the defendants' argument would allow completely arbitrary restrictions on fundamental rights simply because the initial inquiry showed that a "reasonably diligent candidate" could comply. That is clearly not the result intended by the Supreme Court. *See Anderson v. Celebrezze*, 499 F.Supp. 121 at 130–133 (S.D.Ohio 1980).

III. *EQUAL PROTECTION ANALYSIS APPLIED*

Three compelling state interests have been suggested by the defendants, and by courts in other cases, which might justify the restrictions placed on Independent candidates seeking a place on the general election ballot in Maryland: 1) The interest in keeping frivolous candidates off the ballot. 2) The administrative interest in adequate time to verify petitions and print ballots. 3) The interest in the stability of the party system.

The interest of the state in keeping frivolous candidates off the ballot to keep the ballot to a manageable size has been recognized by the Supreme Court. *Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). The Court pointed out that procedures designed to further this interest may aid, rather than hinder effective voter choice:

> A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process.

*Id.* at 715, 94 S.Ct. at 1319. The Supreme Court suggested as one possible method of keeping frivolous candidates off the ballot "the precondition of demonstrating some reasonable quantum of voter support by requiring such parties [or candidates] to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election." *Id.* at 718, 94 S.Ct. at 1321. Thus it is clear that there is a compelling state interest which justifies some sort of petition requirement. In this case, the plaintiffs challenge neither the existence of the requirement, nor the number of signatures required.[6]

The administrative interest ("the need for sufficient time to resolve any challenges to the nomination papers and to prepare ballots in a deliberate and orderly fashion") has also been recognized by the courts. *Salera v. Tucker*, 399 F.Supp. 1258, 1267 (E.D.Pa.1975), aff'd, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976); *see also Anderson v. Celebrezze, supra*, at 133–134. This interest is not at issue, however. The plaintiffs do not challenge the legitimacy of this interest. While this interest does justify some filing deadline, it could not justify the March 3 deadline for Independent candidates. The printing of ballots could not begin until late August in any case, since the Democratic nominee will not be known before them.[7] Nor does verification of signatures on the petitions require that much time. In fact, Maryland law requires that local boards deliver the verified petitions to the State Administrative Board of Election Laws by twenty–one days after the deadline. Article 33, § 7–1(j). Even if it required the full twenty–one days to verify the two–thirds of the signatures due on the final deadline, there would be justification at best for a preliminary deadline for the first third approximately ten or eleven days earlier. In addition to verification by the local boards, there is the requirement that the state board tally the signatures to determine whether a sufficient number were filed. Article 33, § 7–1(k). This process generally takes no more than five days. Stipulation 36(G). Thus it is clear that administrative concerns alone would not justify a deadline any earlier than this year's final deadline of August 4 (although the Court does *not* decide whether administrative needs justify a deadline even that early). Accordingly, unless there is some other state interest justifying the early deadline, Anderson must be allowed to ap-

---

6. A challenge to the number of signatures required would have little merit, since Maryland law requires 3% of the registered voters, while a *requirement of 5% of the total votes cast in* the last general election has been upheld. *Storer v. Brown, supra*, at 738–740, 94 S.Ct. at 1283–1284.

7. In a non–presidential election year, the printing could not begin until even later, since the primary election is in September in such years. Article 33, § 5–2.

pear on the general election ballot in Maryland, if the petitions submitted before August 4 otherwise meet state law requirements.

The other interest advanced by the state is its interest in the stability of the party system. This interest is related to the interest in keeping frivolous candidates off of the general election ballot, in that the party system is one way to narrow the field of candidates. The Supreme Court recognized the legitimacy of this interest in *Storer v. Brown, supra*, at 735, 94 S.Ct. at 1281, where one of the California provisions upheld by the Court was a requirement that an Independent candidate not be affiliated with a political party within the twelve months preceding the filing of his candidacy. This disaffiliation provision had the effect of a "sore loser" provision in that a defeated primary candidate would obviously not be eligible to run as an Independent; in many respects, the California provision was more restrictive than the typical "sore loser" statute, since it required such an early declaration of Independent status. In upholding the law, the Court commented:

> The State's general policy is to have contending forces within the party employ the primary campaign and primary election to finally settle their differences. The general election ballot is reserved for major struggles; it is not a forum for continuing intraparty feuds. The provision against defeated primary candidates running as independents effectuates this aim, the visible result being to prevent the losers from continuing the struggle and to limit the names on the ballot to those who have won the primaries and those independents who have properly qualified. The people, it is hoped, are presented with understandable choices and the winner in the general election with sufficient support to govern effectively.

*Id.* While this language was in reference to a disaffiliation provision, it would also appear to support the narrower "sore loser" provision employed by some states.

Maryland has neither a pure disaffiliation statute, nor a pure "sore loser" provision which would apply here. The March 3 deadline for Independents has the effect of a "sore loser" provision, however, in that any candidate, such as plaintiff Anderson, who goes into the primary campaign to seek his party's nomination, will be ineligible to run as an Independent by virtue of missing the deadline. The defendants argue that the Constitution does not require that they employ either the typical disaffiliation provision or the typical "sore loser" provision in furthering the state interest in a stable party system. While this statement of the law may be accurate, it adds little to the defendants' argument since they justify the state statutes involved because they have the effect of a "sore loser" provision. Specifically, the defendants argue that Article 33, §§ 4A–3 and 7–1(b)(1), "prevent a defeated Presidential candidate for party nomination, like Plaintiff Anderson, from disavowing his party candidacy when it falters, disrupting the political process and causing strife within his party by attempting another candidacy as an 'independent.'" Defendants' Brief at 46. This is exactly the effect of a "sore loser" provision; notwithstanding their disclaimers, the defendants are in essence asking the Court to uphold the Maryland laws because they have that effect.

The Court declines to do so. It would be a different case if Maryland had a "sore loser" provision which explicitly applied to Presidential primary losers seeking to run as Independents.[8] It does not. In fact, the state's "sore loser" provision explicitly excludes presidential primaries.[9] Article 33,

---

**8.** The Court does not decide now whether there would or would not be any constitutional problems with such a provision, since that question is not before the Court.

**9.** It is not clear from the language of the statute, however, whether the exclusion was intended to address situations such as that of

plaintiff Anderson, or whether it was only intended to address the far more common problem of a presidential candidate losing the Maryland primary, but going on to receive his party's nomination. Without removing presidential races from the operation of the "sore loser" law, such a candidate could not appear on the general election ballot in Maryland.

§ 8–2(a). It is only the early deadline which produces this result. The Court is not convinced that a purpose of this deadline was to bring about the same result as a "sore loser" provision. The early deadline has a much broader effect than that. It prohibits *all* Independent candidacies where no certificate was filed by March 3, regardless of the candidate's participation or non–participation in a party primary. Because of this broad coverage, the Court cannot accept the defendants' argument that the statute should be evaluated on the basis that its effect is to keep a defeated primary candidate off of the general election ballot.

In the Ohio case the court rejected the defendants' contention that the effect of the early deadline was the same as a disaffiliation provision, and that the statute should be upheld on that basis. The court found that the law in question "acts as a disaffiliation provision only by mere happenstance, not by any reasonably discernible legislative design." *Anderson v. Celebrezze, supra,* at 135. This Court also finds that the challenged statute produces the effect relied upon by the defendants only by "happenstance", and not by any "reasonably discernible legislative design."

Accordingly, the issue now before the Court is whether the early deadline of March 3 for Independents to file their certificates of candidacy for the presidency is justified by any compelling state interest. The Court limits its consideration to the deadline as it applies to presidential candidates, since there is a clear difference in treatment of Independents and party candidates for president not present elsewhere: although an Independent must file his candidacy by March 3, a party nominee could in theory appear on the general election ballot without having declared his candidacy before the time of the party convention. The Court does not reach the issue of the deadline as it applies in state and local races.

Nor does the Court consider the issue of the number of signatures which must be filed by the early deadline. If the early deadline is unconstitutional, obviously no signatures may be required at that point. If on the other hand the Court were to uphold the deadline, Anderson would be ineligible to run for failure to meet the filing deadline, and there would be no reason to consider the petition requirement. The sole issue to be considered is whether the early deadline itself, as applied to Independents running for president in Maryland, is justified by any compelling state interest. The Court finds it is not.

The defendants suggest that the current law has received implicit approval from the courts because it was drawn up in response to *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), *on remand, Bradley v. Mandel,* 449 F.Supp. 983 (D.Md. 1978). That case arose out of an Independent candidacy for United States Senate in 1976. At that time, Maryland law did not provide for a two–stage submission of petitions, as it does now, but required *all* signatures (three percent of the registered voters) to be submitted by the early deadline (March in presidential primary years). 51,-155 signatures were required, but of the 53,239 which were timely filed by the candidate, only 42,049 were determined to be valid. Bradley filed suit in this Court challenging the early deadline for filing of petitions.

A three–judge court ruled in Bradley's favor. *Bradley v. Mandel,* Civ.No. T–76–638 (D.Md., May 17, 1976). In so ruling, the court relied heavily on *Salera v. Tucker,* 399 F.Supp. 1258 (E.D.Pa.1975), *aff'd,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976). *Salera* involved a challenge to a Pennsylvania statute requiring that all signatures be gathered in a three–week period ending over two hundred days before the general election. The district court found no state interest sufficiently compelling to justify the early petition filing deadline; the Supreme Court summarily affirmed. The Maryland district court also concluded that the early termination date of the signature gathering period substantially burdened the ability of Bradley to get on the ballot, but

did so without any detailed factual inquiry. *Bradley v. Mandel* (1976 unreported case). The court relied on *Salera* for the proposition that the remoteness of the cut–off date alone constituted an impermissible burden on the plaintiff, rejecting the defendants' contention that the district court and the Supreme Court in *Salera* had also considered the shortness of the three–week signature–gathering period.

The Supreme Court remanded the *Bradley* case to the district court for further proceedings, holding that the district court had misinterpreted the summary affirmance in *Salera*. The Court stated that the *Salera* case was distinguishable because of the twenty–one day period, which "enormously increased the difficulty of obtaining the number of signatures necessary to qualify as an independent candidate." *Mandel v. Bradley, supra*, 432 U.S. at 177, 97 S.Ct. at 2241. The Maryland district court, on the other hand, had made no finding as to whether there were substantial burdens on an independent candidate trying to meet the petition deadline. The case was remanded for such a finding, with instructions to determine whether a "reasonably diligent independent candidate" could be expected to meet the deadline. *Id.* at 177, 97 S.Ct. at 2241.

On remand, the district court determined that the early deadline for filing petitions did in fact constitute an unconstitutional burden. It cited factors such as the adverse winter weather conditions before the deadline, the lack of media coverage at that early stage, and the fact that campaign issues had not developed much by that stage; all of these factors made it difficult for an Independent candidate to gather the necessary signatures so early. *Bradley v. Mandel, supra*, 449 F.Supp. at 986. The

court drew similar conclusions upon examination of past experiences of Independent candidates. *Id.* at 987–988.

Both plaintiffs and defendants misread the *Bradley* opinions. The plaintiffs suggest that the *Bradley* court found the filing deadline itself to be unconstitutional. In fact, the court found that the early deadline for filing the signatures was unconstitutional; the court did not reach the issue of whether the filing deadline *per se* was unconstitutional. The defendants, on the other hand, conclude that the *Bradley* cases stand for the proposition that the filing deadline was not *per se* unconstitutional. They rely heavily on the fact that the Supreme Court remanded the case to determine whether the early petition deadline imposed substantial burdens on a "reasonably diligent independent candidate." The reason the Court did this, however, was that the district court had found that the early petition deadline *did* impose burdens without any detailed factual findings upon which to base the conclusion. The defendants argue that if the deadline itself was *per se* unconstitutional, there would have been no point in remanding. Such is not the case. Neither the district court nor the Supreme Court was faced with the question of whether the early deadline by itself was unconstitutional. Bradley in fact had *met* the early deadline for filing his certificate of candidacy and therefore had no reason to complain about it. It was the early deadline for filing *petitions* which he complained of, and it is this requirement which the district court found violative of the Constitution. The courts did not reach the issue of the filing deadline itself, and thus, contrary to the assertions of the parties, the *Bradley* cases do not resolve the present dispute.[10]

---

**10.** The only language in any opinion which supports the contention by the defendants that the district court suggested and endorsed the current two–stage filing process is found in the original opinion before remand. There, the court in rejecting the state's argument that the early filing deadline for petitions and primary candidates treated all equally, stated that "quite readily, Maryland could require independent candidates to file a declaration of candida-

cy at the same time as partisan candidates and then extend the date for the submission of signatures to the date of the primary election." *Bradley v. Mandel*, Civ. No. T–76–638 (D.Md., May 17, 1976) at 11. This statement was merely a rejection of the state's argument that there *was* equal treatment. It does not constitute an endorsement of the present plan. Even if interpreted as a suggestion or endorsement, it is dictum at best. Finally, the court notes that

There are cases which have dealt with the issue of the filing deadline alone. The New Mexico district court, in ruling in Anderson's favor found no compelling state interest which justified a March 4 deadline for Independents, while allowing parties to designate their candidates as late as September 15. *Anderson v. Hooper, supra,* at 11–13. Similarly, the Ohio district court found that the state had "demonstrated no interest served by the filing deadline other than its simple function as an arbitrary point in time by which independent candidates must officially throw their hats into the political ring." *Anderson v. Celebrezze, supra,* at 135.

Most of the previous opinions relied upon by parties are based on somewhat different facts. Perhaps most on point is *MacBride v. Exon,* 558 F.2d 443 (8th Cir. 1977). That case involved a challenge to a Nebraska law which allowed no Independent candidates on the ballot. A candidate other than a major party candidate could get on the ballot only by being the candidate of a third party; third parties were required to meet certain qualifications in advance of the primary election. The court ruled it unconstitutional to have no procedure by which a candidate other than a major party candidate could receive a place on the ballot after the primary. *Id.* at 449. Most of the other cases cited by the plaintiffs are distinguishable, since filing deadlines were struck down only in conjunction with other requirements, such as filing of petitions. As indicated earlier, the only issue before this Court is whether the filing deadline by itself is unconstitutional.

There is one case cited by the defendants which suggests that filing deadlines for Independent candidates before the primary election may be justified. *Socialist Labor Party v. Rhodes,* 318 F.Supp. 1262 (S.D.Ohio 1970), *aff'd. sub nom. Sweetenham v. Gilligan,* 409 U.S. 942, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972). In reaching the conclusion that Independent candidates for Congress and

Governor could be required to file before the primary the court commented that "one may not play dog in a political manger by withholding his determination of candidacy until after party candidates are chosen by the primary process." *Id.* at 1273. Even if this is a compelling state interest (and this Court does not so rule in this case), it would not justify a deadline for Independent candidates for President months before the party conventions, since party nominees for President are not chosen until then.

■ The state has suggested no compelling state interest which would justify the March 3 filing deadline for Independent candidates for President. While administrative needs obviously justify some deadline, this interest does not justify such an early deadline. Therefore, the Court finds that the early deadline for filing a certificate of candidacy imposed on Independent candidates for President by Ann.Code of Maryland, Article 33, §§ 7–1 and 4A–3, is unconstitutional in that it requires Independent candidates to file their candidacies months before the parties designate their nominees, and no compelling state interest has been shown to justify this additional burden on Independent candidates. Because the early deadline for filing the certificate of candidacy is unconstitutional, the early deadline for filing a portion of the petitions must also fall. The Court need not determine the earliest deadline which could be justified by compelling state interests. It does find, however, that no interests have been shown which would justify a deadline for filing the certificate of candidacy or the petitions earlier than August 4, the date currently set by law as the final petition deadline.

In so ruling, the Court emphasizes that it does not rule one way or the other on the constitutionality of "sore loser" provisions as they apply to presidential candidates. Nor does it reach the issue of the constitutionality of Maryland's early deadline for Independent candidates for other offices to file their certificates of candidacy.

this so-called "suggestion" does not include *any* signatures to be filed by the early deadline. While the early filing of signatures is not at

issue in this case, the discrepancy does weaken the defendants' argument of court endorsement of the present law.

Accordingly, it is this 6th day of August, 1980, by the United States District Court for the District of Maryland, ORDERED:

■ 1. That the defendants place plaintiff Anderson on the general election ballot as an Independent candidate for President of the United States if the petitions filed by his campaign on or before August 4, 1980, otherwise meet the requirements of Maryland law; and

2. That a copy of this opinion be sent to counsel for the parties.

## ON MOTION FOR ATTORNEYS' FEES AND COSTS

The plaintiffs in this action have filed a motion for award of attorneys' fees and other costs of litigation pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. The defendants oppose such an award for a number of reasons, as spelled out in their memorandum in opposition to plaintiffs' motion for award of attorneys' fees. For reasons stated below, an award of attorneys' fees will be allowed to the plaintiffs in the amount as specified below.

The Civil Rights Attorney's Fee Awards Act of 1976 [hereinafter, the "Act"] provides, in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. 42 U.S.C. § 1988.

The defendants make the threshold argument that this Court no longer has jurisdiction in this case to award attorneys' fees under § 1988 because the defendants did not move for such fees within ten (10) days of the Court's decision of August 6, 1980. The defendants contend, in contradiction to the clear language of § 1988, that awards of attorneys' fees under the Act are not costs and thus must be sought within ten days of a final judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. This Court finds such an argument unpersuasive.

■ The terms of the Act expressly provide for the awarding of attorney's fees "as part of the costs." 42 U.S.C. § 1988. Neither Rule 54(b) nor Rule 58 of the Federal Rules of Civil Procedure prescribes any period of time after judgment within which an application for costs must be made. The two cases relied upon by defendants for the proposition that the issue of attorneys' fees should be resolved before the entry of the judgment and that failure to do so prevents the plaintiffs from raising the issue at a later time do not compel this Court to deny attorneys' fees under the circumstances in the present case. The opinions in both *White v. New Hampshire Department of Employment Security,* 629 F.2d 697 (1st Cir. 1980) and *Hirschkop v. Snead,* 475 F.Supp. 59 (E.D.Va.1979), stated that attorneys' fees under § 1988 should not be considered as costs. However, in *White,* the plaintiffs moved for attorneys' fees four and one-half months after the district court approved a consent decree and entered a judgment, while in *Hirschkop,* the plaintiff argued that the Court should have raised the issue of attorneys' fees *sua sponte.* In the present case, the plaintiffs sought attorneys' fees in their original complaint and filed a motion and supporting memorandum shortly after the decision of the Fourth Circuit and the determination of the defendants to proceed no further. The merits of this case were handled in a greatly expedited manner and the plaintiffs were not assured of their status as a "prevailing party" until the decision of this Court was affirmed and the defendants decided not to take any further appeals. The decision in *Wright v. Jackson,* 522 F.2d 955 (4th Cir. 1975), does not prevent this Court from awarding attorneys' fees at this time as that case, decided before the enactment of § 1988, involved a request for attorneys' fees pursuant to the Court's equitable powers and the Fourth Circuit was concerned about piece-meal appeals in cases where the trial court later decided to make discretionary awards of costs. 522 F.2d at 957–58. In the present case, it was necessary to resolve the merits of the dispute on an

expedited basis, given the realities of an election year calendar. To hold that the plaintiffs are now barred from obtaining attorneys' fees under § 1988 because the issue was set aside pending resolution of the merits would be both illogical and unfair. Furthermore, the defendants here admit that the only other court, besides *Hirschkop* and *White*, to consider the question has concluded that attorneys' fees under § 1988 are costs. *Knighton v. Watkins*, 616 F.2d 795 (5th Cir. 1980). The clear provisions of the Act support the awarding of attorneys' fees as costs and it is the conclusion of this Court that jurisdiction currently exists for an award of attorneys' fees under § 1988.

The Civil Rights Attorney's Fees Awards Act of 1976, was passed by Congress in response to the Supreme Court's decision in *Alyeska Pipeline Service v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which had rejected the "private attorney general" theory for awarding attorneys' fees in civil rights actions. The standard to control awards of attorneys' fees under the Act was taken from *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam), and was cited with approval in both the Senate and House reports accompanying the 1976 Act, S.Rep.No. 1011, 94th Cong., 2nd Sess. 4, H.R.Rep.No. 94–1558, 94th Cong., 2nd Sess. 6 (1976):

> A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."

This standard has clearly been adopted by the Fourth Circuit. *Bonnes v. Long*, 599 F.2d 1316, 1318 (4th Cir. 1979). The decision in *Bonnes, supra*, also stated that the discretion of the district court in deciding whether to award attorneys' fees to a prevailing party is narrowly limited. 599 F.2d at 1318. Thus, absent a finding of "special circumstances" sufficient to justify the discretionary denial of an award of attorneys' fees to a prevailing party, the plaintiffs are entitled under the Act to an award of attorneys' fees for their successful effort to have the early deadlines imposed on Independent candidates for President by Ann.Code of Maryland, Article 33, §§ 7–1 and 4A–3 declared unconstitutional.

The defendants have asserted that special circumstances exist which would make an award of attorney's fees unjust in this case. For support, they rely principally upon a recent decision, *Concerned Democrats of Florida v. Reno*, 493 F.Supp. 660 (E.D.Fla. 1980), a copy of which was attached to defendants' memorandum. That decision held, on remand, that five factors * which individually are "insufficient to constitute special circumstances creating an award of attorney's fees unjust . . . rise to the level of 'special circumstances,'" when combined together with the "added ingredient of a plaintiff who is a partisan, political organization." *Reno* at p. 664. The decision of that court was buttressed by the determination that, "In considering the facts and circumstances of this case, the court is still of the opinion that an award of attorney's fees is inappropriate." *Reno* at p. 663.

■ Without challenging the correctness of such a determination in the *Reno* case, this Court is of the opinion that, under the facts and circumstances of this case, an award of attorney's fees would not be inappropriate. Each of the factors cited in *Reno* has, as that court and the defendants here candidly admit, been held insufficient on their own to constitute sufficient "special circumstances" required to justify a denial of attorneys' fees under the Act. Furthermore, even if the defendants could show the existence of all five factors in this case, this Court does not believe the plaintiffs should be denied the award of attorneys' fees under the Act because they were acting on behalf of a Presidential campaign organization. There is no precise test or standard to be applied by a court in determining the existence of "special circum-

---

* The five factors cited by the Court in *Reno* were: (1) good faith on the part of defendants; (2) a finding of unintentional discrimination; (3) plaintiff's financial ability to pay counsel fees; (4) defendant's good-faith belief that a challenged statute is valid; and (5) that the burden of a fee award will fall on the taxpayers. *Reno* at p. 664.

stances" sufficient to justify the denial of an award of attorneys' fees to a prevailing party. Rather, it is a discretionary determination that must be made under the guidance of the Fourth Circuit's direction that "the discretion of the district court in deciding whether to award attorney's fees to a prevailing party is narrowly limited." *Bonnes, supra*, at 1318. The Act clearly contemplated that the prevailing parties in actions to enforce the provisions of § 1983 would receive reasonable attorneys' fees as part of the costs. To deny such an award merely on the basis that the plaintiffs were acting on behalf of a Presidential campaign organization or that this Court considers such an award "inappropriate" would be contrary to the dictates of the Act and judicial interpretations thereof. This holding does not mean that under no circumstances could a prevailing party be denied an award of attorney's fees under § 1988. However, the "special circumstances" required to justify such a denial have not been found in the present case and plaintiffs are entitled under the Act to an award of reasonable attorneys' fees.

■ Once a determination is made that a prevailing party is entitled to an award of attorneys' fees under § 1988, the Court must determine the appropriate size of such an award. The Act specifies only that the court should allow "a reasonable attorney's fee." In *Barber v. Kimbrell's Inc.*, 577 F.2d 216 (4th Cir. 1978), the Fourth Circuit adopted the guidelines set by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and directed district courts to look at "twelve factors relevant to the determination of reasonable attorneys' fees":

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. 577 F.2d at 226 n.28.

In light of these factors, the Court finds the amount requested by plaintiffs' attorneys excessive. The case was heard on an expedited schedule in both this Court and the Court of Appeals for the Fourth Circuit. The complex issues of constitutional law were skillfully addressed by counsel for both sides and this Court does not question the experience, reputation or ability of any of the attorneys. However, it is not believed that the attorneys for the plaintiff undertook this litigation with the expectation of receiving over $65,000.00 for their efforts nor would this Court feel justified in making such a large award under the circumstances of this case. The litigation was begun as part of a nationwide campaign to place the candidate on the presidential ballot in each state. The cause was a not unpopular one that attracted volunteer efforts on all levels. Petitions were gathered, publicity generated and funds raised, all on a national basis. In the eyes of many, the effort assumed the characteristics of a "cause celebre." The attorneys involved in this particular case came from both Washington, D. C. and Baltimore, and devoted a great deal of time and energy to the case. The lead counsel from Washington, D. C. was also prominently touted as a leading political adviser to the candidate and all the Washington based attorneys apparently participated in the other cases that were being litigated in other states. There were obvious opportunity costs for all the attorneys involved in pressing this litigation but they were voluntarily assumed on a basis that did not assure any monetary gain. Perhaps not as obvious, were the intangible benefits for the attorneys and law firms involved in such high–profile litigation. Representation of a political underdog in a context such as this was not at all an unat-

tractive task and it is clear that numerous others within the legal community would have jumped quickly at the opportunity, even with no prospect of financial recompense. Legal work such as this is often undertaken for no fee or at greatly reduced rates for a number of reasons, not the least of which is the engendering of professional goodwill and reputation. Under all these circumstances, this Court believes that the amount set forth in plaintiffs' motion is excessive and should be reduced. Plaintiffs' attorneys begin by asking for $43,-453.12, a figure which represents a ¼ reduction of the basic hourly fee in order to allow for the duplication which undoubtedly occurred because of the manner in which the staffing was split between two firms in two different cities. They then apply a "multiplier" of 1.5 to come up with a figure of $65,179.68. For the reasons discussed above, this Court is of the opinion that the multiplier of 1.5 is not justified and that the "lodestar figure" itself should be reduced to $10,000.00. An award of $10,000.00 represents a significant fee for a case that was assumed and litigated under the circumstances described above. To award a greater fee would not be justified in light of the factors discussed in *Barber, supra,* and would result in an inordinately high award to the plaintiffs' attorneys. The Act has been interpreted to allow for attorneys' fees for time spent in litigating the issue of attorneys' fees, *Johnson v. State of Mississippi,* 606 F.2d 635 (5th Cir. 1979), and the award set forth herein takes into account the efforts thus far expended in pursuit of an award of attorneys' fees. In addition to the award of $10,000.00 attorneys' fees as part of costs, the Court finds that the plaintiffs are entitled to reimbursement for disbursements in the amount of $2,578.32. Thus, the total award of costs under Rule 54(d) will amount to $12,578.32, a sum that under the circumstances is considered to be both fair and reasonable.

Accordingly, it is this 19th day of November, 1980, by the United States District Court for the District of Maryland, ORDERED:

1. That the plaintiffs' motion for award of attorney's fees and other costs of litigation be, and the same is, hereby GRANTED to the extent indicated above;

2. That the defendants pay to the plaintiffs COSTS in the total amount of $12,-578.32; and

3. That a copy of this Memorandum and Order be sent to the plaintiffs and to the Attorney General of the State of Maryland.